ORAL ARGUMENT NOT YET SCHEDULED
No. 23-7010

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CONRAD P. SMITH; DANNY L. MCELROY; BYRON EVANS;
GOVERNOR LATSON; MELISSA MARSHALL; MICHAEL FORTUNE;
JASON DEROCHE; REGINALD CLEVELAND, PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, SOLELY IN HIS PERSONAL CAPACITY, DEFENDANT-APPELLANT

and

DONALD J. TRUMP FOR PRESIDENT, INC.; STOP THE STEAL L.L.C.; ALI ALEXANDER,
ALSO KNOWN AS ALI ABDUL RAZAQ; BRANDON J. STRAKA; ROGER J. STONE; PROUD
BOYS, AN UNINCORPORATED ASSOCIATION; PROUD BOYS INTERNATIONAL, L.L.C.;
ENRIQUE TARRIO; ETHAN NORDEAN; JOSEPH R. BIGGS; CHARLES DONOHOE;
DOMINIC J. PEZZOLA; OATH KEEPERS; STEWART RHODES; THOMAS E. CALDWELL;
JESSICA WATKINS; KELLY MEGGS; ALAN HOSTETTER; RUSSELL TAYLOR; ERIK
SCOTT WARNER; FELIPE ANTONIO "TONY" MARTINEZ; DEREK KINNISON; RONALD
MELE; JOHN DOES, 1-10; MAKE AMERICA GREAT AGAIN PAC, DEFENDANTS

On Appeal from the United States District Court
for the District of Columbia, 1:21-cv-2665-APM

---

## BRIEF FOR APPELLEES

---

Katherine Marquart
Lauren M. Blas
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellees*

Jon Greenbaum
Edward G. Caspar
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K ST. NW, SUITE 900
WASHINGTON, D.C. 20005
(202) 662-8600

*Counsel for Appellees*

*[Additional Counsel Listed On Inside Cover]*

Connor S. Sullivan
Mark J. Cherry
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Duncan Taylor
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

Joshua S. Lipshutz
Alyse Ullery-Glod
Samuel Z. Whipple
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Appellees Conrad P.
Smith, Danny L. McElroy, Byron
Evans, Governor Latson, Melissa
Marshall, Michael Fortune,
Jason Deroche, and Reginald
Cleveland*

Faith E. Gay
Joshua S. Margolin
Babak Ghafarzade
Elizabeth H. Snow
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000

*Counsel for Appellees Conrad P.
Smith, Danny L. McElroy, Byron
Evans, Governor Latson, Melissa
Marshall, Michael Fortune,
Jason Deroche, and Reginald
Cleveland*

Marc P. Epstein
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K ST. NW, SUITE 900
WASHINGTON, D.C. 20005
(202) 662-8600

*Counsel for Appellees Conrad P.
Smith, Danny L. McElroy, Byron
Evans, Governor Latson, Melissa
Marshall, Michael Fortune,
Jason Deroche, and Reginald
Cleveland*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees certify as follows:

### A.    Parties

All parties, intervenors, and amici appearing before the District Court and in this Court are listed in the Brief for Appellant.

### B.    Rulings under Review

References to the rulings at issue appear in the Brief for Appellant.

### C.    Related Cases

There are eight other cases involving similar parties and issues in the district courts, seven of which are currently on appeal before this Court:

- *Thompson v. Trump*, No. 1:21-cv-400-APM (D.D.C.) and No. 22-7031 (D.C. Cir.)

- *Blassingame v. Trump*, No. 1:21-cv-858-APM (D.D.C.) and No. 22-5069 (D.C. Cir.)

- *Swalwell v. Trump*, No. 1:21-cv-586-APM (D.D.C.) and No. 22-7030 (D.C. Cir.)

- *Moore v. Trump*, No. 1:22-cv-10-APM (D.D.C.) and No. 22-7120 (D.C. Cir.)

- *Kirkland v. Trump*, No. 1:22-cv-34-APM (D.D.C.) and No. 22-7122 (D.C. Cir.)

- *Tabron v. Trump*, No. 1:22-cv-11-APM (D.D.C.) and No. 22-7121 (D.C. Cir.)

- *Garza v. Trump*, No. 1:23-cv-38-APM (D.D.C.)

- *Michigan Welfare Rights Organization v. Trump*, No. 1:20-cv-03388-ACR (D.D.C.) and No. 22-7164 (D.C. Cir.)

Plaintiffs-Appellees are not aware of any other related case pending before this Court or any other court.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe oral argument is warranted in this matter.  Appellees ask the Court to not delay oral argument pending its decision in the *Blassingame* appeal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION .............................................................................. 1

STATEMENT OF ISSUES ................................................................. 4

STATEMENT OF THE CASE ............................................................ 4

    I.    Factual History .................................................................... 5

        A.    Appellant's conduct before the 2020 Election........................... 5

        B.    Appellant's conduct after the 2020 Election. ........................... 6

    II.    Procedural History.............................................................. 12

SUMMARY OF ARGUMENT ........................................................... 14

STANDARD OF REVIEW ................................................................ 16

ARGUMENT .................................................................................... 16

    I.    Appellant Is Not Entitled to Presidential Immunity........................... 16

        A.    Immunity attaches only to acts within the "outer perimeter" of official duties. ..................................................... 18

        B.    Appellant's attempt to disrupt the lawful functions of a coequal branch of government does not fall within the President's official responsibilities. .......................................... 22

        C.    Even when Appellant's actions are disaggregated, none falls within the bounds of his official responsibilities. ............. 28

    II.    The District Court Rightly Rejected Appellant's Dangerously Overbroad Claims of Presidential Power. ........................................... 31

        A.    Appellant's actions cannot be immunized on the ground that he was speaking as President on a matter of public concern....................................................................... 31

iv

**TABLE OF CONTENTS**
*(continued)*

B.    Appellant has not identified any official responsibility that would encompass the misconduct at issue.........................34

C.    Appellant's motives are irrelevant to presidential immunity. ...................................................................39

D.    This case will not open the "floodgates" to boundless liability for official acts.............................................40

E.    Appellant wrongly conflates Westfall Act immunity with presidential immunity. .......................................42

III.    *Brandenburg* Is Irrelevant to the Scope of Presidential Immunity, and in Any Event, Satisfied Here. ....................................45

A.    Whether Plaintiffs have adequately pleaded incitement under *Brandenburg* is not before this Court. ...........................45

B.    *Brandenburg* is irrelevant to the conduct alleged in the Amended Complaint. .................................................46

C.    *Brandenburg* is irrelevant to presidential immunity................47

D.    Even if *Brandenburg* did supply the appropriate test for analyzing Appellant's claim of immunity, Appellees have satisfied it.........................................................48

IV.    Civil Liability Is a Wholly Independent Form of Relief from Impeachment and Is Warranted Here..................................51

CONCLUSION ......................................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ..................................... 16, 17, 21, 27, 28, 29, 32

*Barr v. Matteo*,
    360 U.S. 564 (1959) ................................................................................16, 21, 22

*Blassingame v. Trump*,
    No. 21-cv-858-APM (D.D.C.) ............................................................................14

*Bible Believers v. Wayne County*,
    805 F.3d 228 (6th Cir. 2015) ............................................................................48

*Bowsher v. Synar*,
    478 U.S. 714 (1986)............................................................................................39

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993)............................................................................................43

*Burns v. Reed*,
    500 U.S. 478 (1991)............................................................................................16

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)............................................................................................46

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) ..............................................................................43

*Carroll v. Trump*,
    66 F.4th 91, 93 (2d Cir. 2023) ..........................................................................44

*Clinton v. City of New York*,
    524 U.S. 417 (1998)............................................................................................38

*Clinton v. Jones*,
    520 U.S. 681 (1997)............. 16, 20, 21, 22, 26, 27, 28, 30, 35, 37, 39, 41, 42, 51

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Elrod v. Reno*,
  239 F.3d 372 (D.C. Cir. 2001) ................................................................ 46

*Ferri v. Ackerman*,
  444 U.S. 193 (1979) ............................................................................. 35

*Forrester v. White*,
  484 U.S. 219 (1988) ............................................................................. 43

*Hess v. Indiana*,
  414 U.S. 105 (1973) ............................................................................. 48

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983) ............................................................................. 39

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880) ............................................................................. 39

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) ............................................................. 34

*Loving v. United States*,
  517 U.S. 748 (1996) ............................................................................. 39

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ............................................................. 50

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ...................................... 2, 16, 18, 19, 20, 21, 22, 25, 26, 27,
  ............................................................ 29, 35, 37, 38, 39, 40, 42, 47, 52

*NSTAR Elec. & Gas Corp. v. F.E.R.C.*,
  481 F.3d 794 (D.C. Cir. 2007) ............................................................... 37

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................................. 48

*Schrob v. Catterson*,
  948 F.2d 1402 (3d Cir. 1991) ................................................................ 51

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................36

*Swalwell v. Trump*,
    No. 1:21-cv-586-APM (D.D.C.) ..................................13, 14

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ................ 13, 29, 32, 36, 37, 38, 45

*Thompson v. Trump*,
    No. 1:21-cv-400-APM (D.D.C.) ..................................13, 14

*United States v. Bell*,
    414 F.3d 474 (3d Cir. 2005) ..............................................46

*United States v. Sattar*,
    395 F. Supp. 2d 79 (S.D.N.Y. Oct. 24, 2005) .............................46, 47

*Wuterich v. Murtha*,
    562 F.3d 375 (D.C. Cir. 2009) ..........................................44

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ......................................................38

**STATUTES**

3 U.S.C. § 1 *et seq* ................................................................26, 38

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XII ............................................................26, 38

U.S. Const. art. I, § 1 ..............................................................38

U.S. Const. art. II, § 1 .............................................................38

U.S. Const. art. II, § 3 .............................................................38

U.S. Const. art. II, § 4 .............................................................52

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

**OTHER AUTHORITIES**

2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863).........................51

# INTRODUCTION

This appeal from the denial of a motion to dismiss asks this Court to answer a single question:  Is Appellant Donald J. Trump absolutely immune from claims arising from his attempt to prevent Congress from certifying the results of the 2020 Presidential Election through the use of force, intimidation, and threats?  The Constitution, Supreme Court precedent, acts of Congress, foundational principles of our democratic republic, and common sense dictate that the answer is no.

Even before the 2020 election took place, Appellant took steps to delegitimize an election defeat.  He made false claims of electoral fraud, calling the election "rigged" and claiming the only way he could lose was through massive voter fraud.  Appellant refused to agree that he would peacefully surrender power if he lost the 2020 election.  And when the American people cast their ballots, electing Appellant's opponent, Appellant refused to concede.  Instead, he launched a coordinated campaign to intimidate election officials into throwing the election in his favor against the will of the voters, and he filed frivolous lawsuits alleging all manner of fabricated voter fraud.  When those tactics failed to gain traction, Appellant organized and incited a riotous mob to attack the Capitol on January 6, 2021, to prevent Congress from certifying the election he lost.  As a direct result of Appellant's actions, Appellees, Capitol police officers, sustained serious and lasting injuries defending the Capitol from the mob.  And once that riotous mob was, in fact, attacking

1

the Capitol, Appellant refused for hours to take any action to stop the violence from escalating.  All of these steps and more, as pleaded in the Amended Complaint, evidence the central action at issue in this case:  Appellant's attempt to prevent Congress from certifying the 2020 election results through force, intimidation, and threats.

The Supreme Court has clearly held that the absolute immunity afforded to the Office of the President applies only to actions within the "outer perimeter" of the President's official responsibility.  *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982).  As the Supreme Court has explained, such immunity exists to protect the constitutional design of separation of powers and to ensure a President can exercise the authority of the office without fear of possible personal liability arising from official actions.  But Appellant has not identified any official responsibilities that were implicated in his attempt to interfere with the peaceful transfer of power.  Nor could he.  The rationales animating presidential immunity require that Appellant face liability here.  Appellant violated the separation of powers by attempting to prevent Congress from fulfilling its duties.  And Presidents *should* consider the possibility of personal liability when deciding whether to orchestrate assaults on the core of our democracy.

At the center of Appellant's hodgepodge of failing arguments is a brand-new test for presidential immunity, concocted for purposes of this appeal with zero legal

support, which would render all Presidents automatically immune for anything they say that is of "public concern."  Appellant's Brief ("Brief") 10, 12–17.  The Court should reject Appellant's proposed test for two reasons.  *First*, it is a transparent attempt at misdirection.  Appellant's mere speech is not the conduct at issue in this case.  What is at issue is Appellant's attempt to block Congress's certification of the results of the 2020 Election, as pled in Appellees' Amended Complaint.  Appellant asks the Court to ignore this months-long course of conduct (which involved more than just speech), which culminated in devastating consequences on January 6, including actual interference with Congress's certification of the election and serious injuries to Appellees.

*Second*, Supreme Court precedent makes clear that a President is not immune from conduct, speech or otherwise, that extends beyond the scope of his official responsibilities.  And Appellant's conduct in attempting to prevent Congress from discharging its duties clearly is beyond the scope of a President's official responsibilities.

Resolution of Appellant's immunity claim in this case is straightforward and consistent with established principles of presidential immunity.  Agreeing with private actors to prevent Congress from discharging its responsibilities is so far outside the outer perimeter of a President's official responsibilities as to be, for over 230 years since ratification of the Constitution, utterly inconceivable.  The alternative

3

pushed by Appellant would mean that it is *within* the scope of presidential responsibility to use force to stop a coequal branch of government from doing its job. Nothing could be more antithetical to the separation of powers principles that justify presidential immunity.

## STATEMENT OF ISSUES

On the facts alleged in the Amended Complaint, whether former President Donald J. Trump is entitled to presidential immunity from civil suit for the harm his conduct caused the Plaintiffs-Appellees.

## STATEMENT OF THE CASE

Appellees are eight United States Capitol Police Officers who filed suit against Appellant and others after suffering emotional and physical harm defending the United States Capitol during the January 6, 2021 attack (the "January 6 Attack"). Appellees claim that Appellant and his co-conspirators violated 42 U.S.C. § 1985(1) ("Section 1985(1)"), by conspiring "to prevent, by force, intimidation, or threat, any person from accepting or holding any office . . . or from discharging any duties thereof . . . or to injure [any officer] in his person or property on account of his lawful discharge of the duties of his office." Appellees further claim that Appellant aided and abetted assault and battery against them. No other defendant is a party to this interlocutory appeal.

## I.    Factual History

Appellees allege that Appellant attempted to prevent Congress from completing its statutory and constitutional duties to certify the results of the November 2020 Presidential election (the "2020 Election") through force, intimidation, and threats. As alleged in the Amended Complaint, Appellant's attempt to interfere with Congress's duties is demonstrated by his conduct both before and after the 2020 Election.

### A.    Appellant's conduct before the 2020 Election.

Throughout the 2020 campaign season, Appellant led a concerted effort to perpetuate false claims that the 2020 Election was "rigged" and that the only way he could lose was through massive voter fraud. JA60, ¶ 50. As a candidate, Appellant deliberately and repeatedly pushed this message to his supporters to delegitimize the election and stoke anger among his followers, and to prevent anyone else from taking office in the event Appellant lost the election. JA61, ¶ 54. As Election Day drew near, Appellant refused to commit to the peaceful transition of power or agree that he would acknowledge any opponent's electoral victory, even after publicly acknowledging that his supporters were rioting over his claims. *Id.* Appellant continued to repeat cries of false election fraud to incite outrage among his supporters over the election process, knowing full well that his supporters were angry and willing to turn to violence. JA50, ¶ 5; JA60–63, ¶¶ 50, 56–60. For example, Appellant was aware that in October 2020, nearly 100 vehicles of his supporters surrounded his

5

opponent's campaign bus in Texas and tried to run the bus off the road. JA62, ¶ 56. Appellant openly celebrated and promoted this violent interference with his opponent's campaign, and he encouraged and supported similar acts of violence by his supporters throughout his candidacy. JA50, ¶ 5; JA60–63, ¶¶ 50, 56–60.

## B.    Appellant's conduct after the 2020 Election.

*Launching a Campaign of Disinformation and Intimidation*

Following Election Day on November 3, 2020, voting returns signaled that Appellant had lost the election. JA64, ¶ 61. In response, Appellant coordinated with his campaign organization, Donald J. Trump for President, Inc., whose name was later changed to Make America Great Again PAC following the election (the "Trump Campaign"), JA54, ¶ 21, and others to promote the falsehood that only widespread voter fraud could have caused Appellant to lose the election. JA64, ¶ 61. Appellant and the Trump Campaign escalated their false claims of election fraud and encouraged his supporters and election officials to interfere with the ballot counting process. JA64–65, ¶ 62. For example, Appellant's official campaign Twitter account began posting tweets with the hashtags "#stopthesteal" and "#fightthefraud." *Id.*

On November 7, 2020, four days after votes were cast, major news outlets called the election for President Biden. JA65, ¶ 63. Following his electoral loss, Appellant, the Trump Campaign, and their attorneys filed scores of baseless lawsuits

in various state and federal courts, challenging the election results and asserting false and fabricated claims of voter fraud. JA65, ¶ 64. These lawsuits were part of Appellant's coordinated strategy to cast doubt on the election results, agitate his supporters, and provide cover for Appellant and his co-conspirators while they devised a plot to overturn the election. *Id.* The lawsuits were filed and financially supported by Appellant and the Trump Campaign. JA65–67, ¶¶ 66, 68–69.

After the electors of the Electoral College cast their ballots on December 14, 2020, it was apparent that President Biden would assume the Presidency. JA75, ¶ 83. Federal law required that Congress convene to formally count these ballots and declare a winner on January 6, 2021. JA74–75, ¶ 82.

In response, Appellant and his co-conspirators intimidated and threatened state and local election officials in key battleground states such as Michigan, Arizona, Georgia, and Pennsylvania to attempt to force them into reneging their vote counts or otherwise rejecting the election results in their jurisdictions. JA67–68, ¶ 70. Appellant specifically targeted individual state and local election officials, and in response, Appellant's supporters threatened other state and local officials. *Id.*; *see also* JA70–71, ¶¶ 73–75. Among other things, on January 2, 2021, Appellant—along with representatives from the Trump Campaign—attempted to intimidate Georgia Secretary of State Brad Raffensperger. JA71–72, ¶ 76. Appellant told Secretary Raffensperger that "the people of Georgia are angry, the people of the country

7

are angry," "there's nothing wrong with saying that, you know, that you've recalculated," and "I just want to find 11,780 votes, which is one more than we have [and one more than the 11,779 vote margin of defeat] because we won the state. . . . Fellas, I need 11,000 votes. Give me a break." *Id.* Following Appellant's lead, his supporters threatened violence against Secretary Raffensperger, saying his "life depends" on not "botch[ing] this recount," and that he deserved to "face a firing squad." JA70, ¶ 73. Despite being aware of these threats, Appellant encouraged his supporters, calling Raffensperger an "enemy of the people." *Id.* Appellant also knew that his supporters in white supremacist and extremist groups were using violence and intimidation at demonstrations and rallies on his behalf, but he nevertheless actively promoted these rallies to his followers. JA72–74, ¶¶ 77–81.

As the Electoral College certification drew near, Appellant and his co-conspirators worked to do everything they could to stop Congress from counting those ballots and declaring the winner of the election, including by using force, intimidation, and threats. JA75, ¶ 83. Appellant's personal and campaign attorneys also drafted meritless legal memoranda detailing the ways in which Vice President Pence could halt the vote on January 6. JA89, ¶ 112. Appellant's campaign organization reimbursed some of these attorneys for legal work on the memoranda. *Id.*

*Planning and Financing the January 6 Rally*

As it became clear that government authorities would not take action to prevent President Biden from assuming office, Appellant took it upon himself and his campaign to act. JA77, ¶ 88. He called on his supporters to converge on Washington, D.C., for a rally on January 6, 2021 (the "January 6 Rally"), encouraging his Twitter followers to attend a "[b]ig protest in D.C. on January 6th" that would "be wild!" JA76–77, ¶ 87. Appellant was intimately involved in planning and coordinating the January 6 Rally. He and his campaign staff provided financial support, applied for the rally permit, chose rally vendors and speakers, encouraged attendance, and prepared and distributed promotional materials for the rally and march. JA75–78, ¶¶ 84–85, 87–89.

*Inciting a Riot*

During the January 6 Rally, Appellant, members of his campaign, and co-conspirators purposefully riled up the crowd with false stories of election fraud. JA75, ¶ 84; JA90–92, ¶¶ 114–20. Appellant spoke last at the rally, telling the crowd "we will never give up" or "concede" and that "[w]e must stop the steal and then we must ensure that such outrageous election fraud never happens again, can never be allowed to happen again." JA90–91, ¶ 115. Though no march was permitted, Appellant told the crowd that they would "walk down to the Capitol" after the rally and "cheer on our brave Senators, and Congressmen and women. We're probably not

going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength . . . ." JA91, ¶ 116 (emphasis omitted). When the crowd began to chant "Storm the Capitol," Appellant exclaimed that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules . . . we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore." JA91–92, ¶¶ 118–19. Appellant concluded his speech by directing the angry mob to "walk down Pennsylvania Avenue" and give "weak" Republicans the "pride and boldness . . . to take back our country!" JA92, ¶ 120. Knowing the size and temperament of the crowd, Appellant attempted to intimidate Congress into stopping the certification, tweeting "Washington is being inundated with people . . . . Our Country has had enough, they won't take it anymore!" JA88–89, ¶ 110. Upon arriving at the Capitol, attackers led the rally crowd in an assault on the Capitol, pushing past barriers and overwhelming law enforcement to infiltrate the building and halt the count. JA92–94, ¶¶ 123–26. Appellant used the delay created by the attack as an opportunity to contact members of Congress and pressure them to delay further or stop the Congressional count. JA52, ¶ 9; JA102–04, ¶¶ 147–49, 152.

_Ratifying the Riot_

As news networks and social media broadcast images of the January 6 Attack, Appellant egged on the attackers, tweeting that Vice President Pence's willingness

10

to certify the election was due to his lack of "courage to do what should have been done to protect our Country and our Constitution." JA101–02, ¶ 145. Even after Appellant was made aware that the Vice President and Congress had to flee the Capitol for safety, he refused for hours to intervene. JA102, ¶¶ 147–48. When House Minority Leader Kevin McCarthy called Appellant during the January 6 Attack, begging him to call off the attackers, Appellant refused, saying "I guess these people are more upset about the election than you are." *Id.*, ¶ 148. Appellant waited for two hours after the Capitol had been breached before tweeting a video telling the attackers to go home. JA103, ¶ 150. Even then, Appellant ratified the crowd's conduct, telling the attackers that "We love you. You're very special." *Id.* Appellant praised the attack, tweeting "[t]hese are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots[.]" *Id.* Long after the January 6 Attack, Appellant continued to defend the attackers and has claimed that they are "being persecuted so unfairly relating to the January 6th protest concerning the Rigged Presidential Election." JA104, ¶ 154.

Appellees are Capitol police officers who fulfilled their lawful obligations to protect the Capitol and its grounds during the January 6 Attack. As a direct result of Appellant's actions, Appellees suffered numerous physical and emotional injuries. JA105–10, ¶¶ 156–65. Among other things, Appellees were hit with clouds of mace, pepper spray, bear spray, fire extinguishers, and other noxious pollutants sprayed by

the attackers. *Id.* Some Appellees' exposure was so severe that they suffered chemical burns. *Id.* Appellees were repeatedly physically assaulted by attackers and suffered numerous injuries to their heads and bodies as a result of their resolve to defend the Capitol and protect members of Congress. *Id.* The trauma they experienced while fighting to defend the Capitol and the lives of members of Congress and their staff caused Appellees to suffer—and continue to suffer—significant emotional injuries, including, for example, post-traumatic stress, sleeplessness, and severe persistent anxiety. *Id.*

Although his efforts to stop Congress from certifying the results of the 2020 Election ultimately failed, Appellant has since repeatedly endorsed the crowd's attempt to overturn the "rigged" election that day. JA101–04, ¶¶ 144–46, 153–54.

## II.  Procedural History

On August 26, 2021, Appellees sued Appellant and other Defendants to remedy physical and mental harms suffered during the attack and amended their complaint once on December 3, 2021. In the Amended Complaint, Appellees alleged, among other things, that Appellant and other Defendants violated Section 1985(1), by conspiring "to prevent, by force, intimidation, or threat, any person from accepting or holding any office . . . or from discharging any duties thereof . . . or to injure [any officer] in his person or property on account of his lawful discharge of the duties of his office." JA110–11, ¶ 167.

Appellant moved to dismiss Appellees' claims, arguing, among other things, that Presidents are entitled to presidential immunity for actions taken in execution of their duties, and that presidential immunity extended to Appellant's actions during and leading up to the January 6 Attack. *Conrad P. Smith v. Donald J. Trump*, No. 1:21-cv-2265-APM (D.D.C.), ECF No. 103. Notably, Appellant did not argue that Appellees had failed to plausibly plead he conspired to interfere with civil rights. JA132 (noting the Trump Defendants are "[c]uriously, the only Defendants that have not" argued that "Plaintiffs have failed to plead a plausible conspiracy to support a claim under § 1985(1)").

On January 26, 2023, the District Court denied Appellant's motion with respect to Appellees' Section 1985(1) claim.[1] In so doing, the District Court incorporated its decision in *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022). In *Thompson*, the District Court ruled on three cases against Appellant and others that, like the present case, were related to the January 6 Attack. *See Thompson v. Trump*, No. 1:21-cv-400-APM (D.D.C.) (filed Feb. 16, 2021); *Swalwell v. Trump*, No. 1:21-cv-586-APM (D.D.C.) (filed Mar. 5, 2021); *Blassingame v. Trump*, No. 1:21-cv-

---

[1] The District Court granted Appellant's motion to dismiss Appellees' claim under 42 U.S.C. § 1986, finding that presidential immunity did bar any liability for failure to exercise his presidential powers. The Court also dismissed Appellant's claim arising under the D.C. Bias-Related Crimes Act of 1989 and the common-law claim of negligence. All other claims against Appellant remain intact.

858-APM (D.D.C.) (filed Mar. 30, 2021).  As in Appellees' case, Appellant moved to dismiss the *Thompson* cases, making similar arguments for presidential immunity. *See* Mot. to Dismiss, *Thompson v. Trump*, No. 1:21-cv-400-APM (D.D.C. May 26, 2021), ECF No. 22; *Swalwell v. Trump*, No. 1:21-cv-586-APM (D.D.C. May 24, 2021), ECF No. 14; *Blassingame v. Trump*, No. 1:21-cv-858-APM (D.D.C. June 24, 2021), ECF No. 10.  In that decision, the District Court rejected Appellant's argument that he could not be held liable under Section 1985(1) for certain actions taken during and leading up to the January 6 Attack on the ground that they were taken in execution of his presidential duties and therefore entitled to presidential immunity. Here, the District Court rejected this argument for the same reasons it did in *Thompson*.  Appellant filed a timely appeal, challenging only the District Court's denial of presidential immunity.

## SUMMARY OF ARGUMENT

Appellant, in concert with others, attempted to prevent Congress from certifying the 2020 Election results through force, intimidation, and threats.  JA49, ¶ 2. Because this conduct did not fall within the outer perimeter of Appellant's official responsibilities as President, he is not entitled to presidential immunity.  *See* Section I.

This Court should reject Appellant's argument that he should be immune from liability for his speech on matters of public concern.  Appellant's argument fails,

14

both because Appellant's conduct at issue goes well beyond mere speech and because his "public concern" test runs contrary to the Supreme Court's definition of presidential immunity. *See* Section II.A, B. Appellant presents a hodgepodge of additional arguments for allowing him to escape liability here, but each fails. *See* Section II.C, D.

Appellant also addresses the *Brandenburg* standard for incitement. The parties agree that the *Brandenburg* standard is irrelevant because it has nothing to do with presidential immunity. *See* Section III. Regardless, even if *Brandenburg* could determine the scope of presidential immunity, the allegations in the Amended Complaint satisfy that standard. *Id.*

Finally, Appellant's suggestion that holding him civilly liable would "thwart" the Senate's decision not to convict him on an article of impeachment, Brief 36, misapprehends the fact that impeachment and civil liability are wholly separate remedies with different standards and consequences. *See* Section IV. The fact that Appellant was not removed from office has no bearing on whether he should be held liable for conduct that had nothing to do with his official responsibilities. Nor does the existence of impeachment as a theoretical means to remove a President justify insulating Appellant from liability for acts outside the farthest reach of his official responsibilities. This Court should affirm the District Court's denial of immunity and permit Appellees to seek redress from Appellant for their injuries.

15

## STANDARD OF REVIEW

Where, as here, courts are asked to evaluate claims of presidential immunity at the pleadings stage, they "assume the truth of the . . . factual allegations in the complaint," *Clinton v. Jones*, 520 U.S. 681, 685 (1997), and ask whether the acts alleged fall within the "outer perimeter" of the President's responsibilities, *Fitzgerald*, 457 U.S. at 756. An "official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1141 (D.C. Cir. 2015). When evaluating whether immunity is applicable, "the appropriate focus . . . is on the relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.'" *Banneker Ventures*, 798 F.3d at 1141 (quoting *Barr v. Matteo*, 360 U.S. 564, 573 (1959)).

## ARGUMENT

## I.    Appellant Is Not Entitled to Presidential Immunity.

As alleged, Appellant attempted "to prevent Congress from certifying the election results through the use of force, intimidation, and threats." JA49, ¶ 2. The only question presented in this appeal is whether, taking those allegations as true, Appellant is shielded from liability because he happened to occupy the Office of the President of the United States when he did so. The answer, as the District Court

correctly found, is of course not.  No rationale justifying the application of presidential immunity is implicated here.  Quite the opposite.  The conduct alleged in this action has nothing to do with the official duties of the Presidency.  And the prospect of liability for that conduct could not possibly interfere with the Presidency's exercise of its designated powers.  A finding of immunity here would, in fact, erode separation of powers rather than protect that pillar of our democracy that has, throughout the history of our nation, helped to ensure the peaceful transition of power.

Appellant attempts to argue otherwise by mischaracterizing the Amended Complaint as if it alleges only that Appellant should be liable for "speech address[ing] matters of public concern," and insisting that he should be immune from claims arising from such speech.  Brief 12.  But that is not what the Amended Complaint alleges.  In analyzing whether Appellant has immunity from liability for the claims in this case, this Court must focus on "the act complained of," *Banneker Ventures*, 798 F.3d at 1141, that is, the conduct at issue in the Amended Complaint.  Here, the conduct at issue is Appellant's attempt to prevent Congress from discharging its duties concerning the certification of the 2020 Election results through the use of force, intimidation, and threats.  Clearly such conduct lies nowhere within the outer perimeter of presidential authority.

17

A.     **Immunity attaches only to acts within the "outer perimeter" of official duties.**

The Supreme Court first articulated the doctrine of presidential immunity—and its limits—in *Nixon v. Fitzgerald*, 457 U.S. 731, 754–55 (1982). There, a former Air Force employee brought suit alleging that President Nixon had undertaken a re-organization of the Air Force specifically to eliminate the former employee's job in retaliation for the former employee's testimony before Congress. *Id.* at 733–34. President Nixon argued that presidential immunity provided a complete defense against the plaintiff's claims. *Id.* at 740–41.

The Supreme Court held that the President is immune to civil claims arising from his conduct while in office, but only when those acts are "within the outer perimeter of [the President's] official responsibility." *Fitzgerald*, 457 U.S. at 756. The Court explained that "the scope of an official's absolute privilege . . . must be related closely to the immunity's justifying purposes." *Id.* at 755. And the Court identified the "justifying purposes" of presidential immunity. *Id. First*, the Court noted that presidential immunity was a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749. Allowing Presidents to face personal civil liability resulting from their official acts, the Court explained, created a "danger[]" that a court overseeing and ultimately adjudicating that litigation would "intru[de] on the authority and functions of the Executive Branch." *Id.* at 754. In other

18

words, immunity was required under "a constitutionally mandated separation of powers." *Id.* at 749. As Chief Justice Burger explained in his concurrence in *Fitzgerald*, "[t]he essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches." *Id.* at 760–61 (Burger, C.J., concurring). Therefore, extending immunity to claims arising from the official acts of the President was required to avoid upsetting the Constitution's careful balance of powers among the branches of the federal government.

*Second*, and closely related, the Supreme Court held that presidential immunity was justified by a concern that, without it, "the prospect [of] damages liability may render [the President] unduly cautious in the discharge of his official duties." *Fitzgerald*, 457 U.S. at 752 n.32. In other words, the Court concluded that if a President feared personal civil liability resulting from some official decision, the President might hesitate to make that decision or might choose a different path worse for the Nation but with less personal risk. And if so, allowing litigation against the President to proceed would effectively limit the President's ability to exercise "the authority and functions of the Executive Branch." *Id.* at 754.

In *Fitzgerald*, the Court concluded that President Nixon's alleged conduct was within the scope of his official duties:

> It clearly is within the President's constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force. . . . Because this mandate of office must include the authority to prescribe reorganizations and reductions in force, we conclude that [President Nixon's] alleged wrongful acts lay well within the outer perimeter of his authority.

457 U.S. at 755. And because those acts were within the "outer perimeter" of the President's authority, President Nixon was immune from claims arising from those acts. *Id.* Notably, the *Fitzgerald* Court made no effort to disaggregate President Nixon's alleged conduct into individual decisions, acts, communications, and speeches. Instead, the Court evaluated the conduct at issue in the case—President Nixon's decision to reorganize the Air Force—and considered whether he was immune for claims arising from that overall decision.

Later, the Supreme Court further clarified the scope of presidential immunity in *Clinton v. Jones*, 520 U.S. 681 (1997). There, President Clinton argued that presidential immunity should require staying civil litigation brought against the President personally while in office, even if that litigation arose from acts taken before the President entered office. *Id.* at 684, 686. The Court rejected that argument: "an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office" was "unsupported by precedent." *Id.* at 695. Instead, the Court "made clear" that presidential immunity is grounded in "the nature of the function performed, not the identity of the actor who performed it." *Id.*

In *Jones*, "whatever the outcome . . . there [was] no possibility that the decision [would] curtail the scope of the official powers of the Executive Branch. The litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power." 520 U.S. at 701. In other words, the concerns present in *Fitzgerald*—the prospect that civil liability would "intru[de] on the authority and functions of the Executive Branch," *Fitzgerald*, 457 U.S. at 754—were not implicated where the President was being sued for conduct that did not relate to his official responsibilities. For that reason, the Court held that President Clinton could not claim immunity: the President is "otherwise subject to the laws for his purely private acts." *Jones*, 520 U.S. at 696.

This Court has regularly applied these principles in a variety of contexts. For example, in *Banneker Ventures*, this Court evaluated whether a board member of the Washington Metropolitan Area Transit Authority ("WMATA") was immune from claims arising from his involvement in the award of WMATA development contracts. 798 F.3d at 1125. Although it did not involve the President, the logic of *Banneker Ventures* applies here as well. *Banneker Ventures* instructs that "the appropriate focus [of an immunity analysis] . . . is on the relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.'" *Id.* at 1141 (quoting *Barr v. Matteo*, 360 U.S. 564, 573

21

(1959)).  This approach mirrors the Supreme Court's analysis in *Fitzgerald*, which asked whether President Nixon's alleged wrongdoing was "within the President's constitutional and statutory authority," *Fitzgerald*, 457 U.S. at 757, and in *Jones*, which explained that the scope of absolute immunity, including presidential immunity, is determined by "the nature of the function performed, not the identity of the actor who performed it," *Jones*, 520 U.S. at 695.

Under these standards, this Court need only determine if the Amended Complaint alleges conduct by Appellant that falls "within the President's constitutional and statutory authority[.]" *Fitzgerald*, 457 U.S. at 757.  For the reasons described below, Appellant cannot seriously contend that the conduct alleged—his attempt to prevent a coequal branch of government from discharging its duties—bears any relation to a President's official responsibilities.

### B.    Appellant's attempt to disrupt the lawful functions of a coequal branch of government does not fall within the President's official responsibilities.

As alleged in the Amended Complaint, Appellant attempted to prevent Congress's certification of the election through force, intimidation, and threats.  JA49, ¶ 2.  He agreed with private actors to use force to prevent Congress from discharging its responsibilities concerning the certification of the election he lost.  *Id.*; JA110–12, 166–72.  He encouraged the use of force, intimidation, and threats to try to stop

the Congressional count of electoral votes.  JA52, ¶ 9.  And he aided and abetted the battery and assault of Appellees.  JA118–19, ¶¶ 201, 207.

Immediately following the election, already trailing in the vote count, Appellant "deliberately and persistently made and encouraged false claims of election fraud to discredit the outcome of the election and disingenuously incite outrage among his supporters"—watering the seeds of distrust which he had planted throughout the campaign season.  JA50, ¶ 5; JA60–61, ¶¶ 50–54; JA64–65, ¶¶ 61–62.  Appellant did this "knowing full well that among his supporters were extremist groups and individuals," now his co-Defendants in this action, "who had demonstrated their propensity to the use of violence against those they regarded as critical of [Appellant]."  JA50, ¶ 5; JA61–63, ¶¶ 55–60.  Appellant filed baseless lawsuits asserting sanctionable claims of election fraud, which were designed to "agitate many [of Appellant's] supporters by reinforcing in them the false belief that they had been defrauded," JA65–66, ¶¶ 64–67, and he observed as his supporters responded to his provocations by threatening electoral officials and attacking the buildings in which ballots were being counted, JA66–72, ¶¶ 68–76.

"[Appellant] knew that his actions were encouraging and causing [co-defendants and others] to use violence and intimidation at demonstrations and rallies on his behalf" throughout November and December 2020—rallies which he actively promoted.  JA72–74, ¶¶ 77–81.  Appellant "planned and organized" the culminating

23

rallies on January 5–6, "arranged financial support," and prepared for "a march to the Capitol" which the event permit forbade.  JA75–76, ¶¶ 83–86.  He then called upon his supporters to come:  "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"  JA76–77, ¶ 87.  Appellant sent this rallying call, which he repeated over the following weeks, "intend[ing] and expect[ing]" that his co-Defendants would understand his "instructions to use any means necessary, including force, intimidation, and threats, to prevent Congress from counting the electoral votes."  JA76–81, ¶¶ 87–96.  As the crowds descended on Washington, D.C., Appellant continued to stoke his supporters with "false and provocative statements," intimidate members of Congress, and demand that Vice President Pence cancel the electoral vote count.  JA87–90, ¶¶ 107, 110–13.

After all this planning, Appellant took the final steps to execute his scheme at the January 6 Rally.  Appellant and the Trump Campaign's hand-picked line-up of speakers opened the event for Appellant; they repeated the false narrative of election fraud, employed violent rhetoric, and insisted the crowd march to the Capitol.  JA75, ¶ 84; JA90, ¶ 114.  Appellant "escalated his rhetoric" in his speech at the Ellipse, riled the crowd into "an angry mob ready to employ violence," and directed his supporters to "walk down" with him to the Capitol and "show strength" to "take back our country."  JA90–92, ¶¶ 114–22.  Following Appellant's directions, his supporters went to the Capitol and did as they were told.  JA95–96, ¶¶ 129, 131; JA100–01,

¶¶ 142–43.  They breached the Capitol's defenses, forced entry, assaulted Appellees and other Capitol police officers, and delayed Congress' electoral vote count.  JA98–99, ¶¶ 136–40.

Appellant's actions and speech leading up to and at the Ellipse are not the only conduct he is alleged to have engaged in on January 6.  As the attackers pressed further into the Capitol, Appellant refused to call off the attackers, egged them on with tweets against Vice President Pence, and used the chaos to continue to pressure legislators and Pence to stop the electoral vote count.  JA52, ¶ 9; JA101–03, ¶¶ 144–49.  Afterwards, Appellant praised the Attack, and confirmed that his goals were aligned with the attackers.  JA52, ¶ 9; JA103–04, ¶¶ 150, 152–54.  Discovery likely will elicit further evidence of Appellant's attempts to prevent Congress's certification of the 2020 Election, including private communications between Appellant and others as well as other nonpublic conduct by Appellant.

Taking these allegations as true, Appellant's conduct at issue falls far beyond "the 'outer perimeter' of [the President's] official responsibility."  *Fitzgerald*, 457 U.S. at 756.  The chief executive of our democratic republic is not tasked with circumventing the constitutionally prescribed separation of powers to prevent another coequal branch of government from doing its job.  The Office of the President plainly did not provide Appellant a mandate to wage war against the fundamentals of our

democracy.  That is enough for this Court to summarily reject Appellant's lead immunity argument.

The "justifying purposes" of presidential immunity, *Fitzgerald*, 457 U.S. at 755, require the same result.  *First*, granting Appellant immunity from civil liability would do nothing to protect the "doctrine of separation of powers."  *Id.* at 748.  The possibility of civil liability on these allegations will not "intru[de] on the authority and functions of the Executive Branch" or "curtail the scope of the official powers of the Executive Branch."  *Id.*; *Jones*, 520 U.S. at 693–94, 699–702.  To the contrary, Appellant's alleged conduct is directly at odds with the separation-of-powers principles that justify presidential immunity in the first place.  As alleged, Appellant attempted to disrupt Congress's performance of a constitutional duty—certification of the election—through force, intimidation, and threats.  "The *essential purpose* of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, *free from risk of control, interference, or intimidation by other branches*."  *Fitzgerald*, 457 U.S. at 760–61 (Burger, C.J., concurring) (emphasis added); *see also Jones*, 520 U.S. at 701 ("[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").  Appellant is alleged to have worked for months to disrupt the ability of the Legislative Branch to exercise one of its responsibilities.  *See* U.S. Const. amend. XII; 3 U.S.C. § 15 (procedure for counting

electoral votes).  Because Appellant's misconduct directly trampled on power entrusted to a coequal branch of government, declining to extend the immunity Appellant seeks will "serve broad public interests—not in derogation of the separation of powers, but to maintain their proper balance."  *Fitzgerald*, 457 U.S. at 754.

*Second*, there is no risk that allowing civil liability here would undermine presidential immunity's "central concern . . . to avoid rendering the President 'unduly cautious in the discharge of his official duties.'"  *Jones*, 520 U.S. at 693–94 (1997) (quoting *Fitzgerald*, 457 U.S. at 752).  None of the conduct alleged in the Amended Complaint constitutes an "official duty" of the Presidency.  And, unlike in *Fitzgerald*, there is no concern that the prospect of civil liability could potentially "diver[t] . . . the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision."  *Id*. at 694 n.19.  Any official who plans, incites, and directs an attack on a coordinate branch of government should fear being held liable for doing so, just as anyone who engages in tortious conduct should fear the prospect of tort liability—liability exists in part to deter misconduct.  In *Fitzgerald*, the Court granted immunity out of concern that "[c]ognizance of [] personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve."  457 U.S. at 753.  Here, just the opposite holds:  Extending immunity to

future Presidents who engage in such conduct would endanger the country, not pro-
tect it.

Ultimately, "[t]he burden of establishing immunity must be borne by the offi-
cial claiming it." *Banneker Ventures*, 798 F.3d at 1140.  Appellant does not seriously
engage Appellees' allegations that he attempted to disrupt Congress's discharge of
its duties, which is the heart of the Amended Complaint.  Therefore, Appellant can-
not carry his burden to justify immunity.  On that basis alone, Appellees must prevail
in their "right to an orderly disposition of [their] claims."  *Jones*, 520 U.S. at 710.

### C.    Even when Appellant's actions are disaggregated, none falls within the bounds of his official responsibilities.

*Fitzgerald* and *Jones* make clear that the correct approach to evaluating pres-
idential immunity is to consider the alleged conduct at issue and determine whether
that conduct constitutes an "official act" of the Presidency such that it must be im-
munized.  Using that proper analysis, of course Appellant is not absolutely immune
from the harm caused by his attempt to obstruct Congress' certification of the 2020
Election.

Appellant urges this Court to take a different approach:  Instead of evaluating
the whole course of conduct alleged in the Amended Complaint, he would have this
Court dissect the alleged acts and evaluate them one-by-one to determine whether
any of them arguably constitutes an act within the scope of the President's official
responsibilities.  That approach is incorrect, and the Supreme Court has never

endorsed it. *See, e.g.*, *Fitzgerald*, 457 U.S. at 756–57 (considering whether the President was immune from claims arising from "prescrib[ing] the manner in which the Secretary will conduct the business of the Air Force"); *cf. Banneker Ventures*, 798 F.3d at 1141 ("The appropriate focus . . . is on the relationship between the act complained of and the corresponding matters committed by law to the official's control or supervision." (citation and quotation marks omitted)). But even if this Court attempted to divide the allegations in the Amended Complaint into the smallest possible components, the result would be no different. The District Court already applied that analysis in its decision below in evaluating the exact individual steps that Appellant would have this Court evaluate (which themselves represent only a fraction of the conduct alleged in the Amended Complaint, *see infra* Section II.A.1). And the District Court concluded that even taken one-by-one, none of those separate steps were "official acts" and therefore were not eligible for presidential immunity. *Thompson*, 590 F. Supp. 3d at 82–83.[2] The District Court was correct about each of these separate acts.

In its decision in *Thompson*, which the District Court adopted below, the Court rightly and intuitively held that the following "were not official acts," *Thompson*, 590 F. Supp. 3d at 82–83:

---

[2] The District Court incorporated its *Thompson* decision by reference in its decision below here. JA125.

- "tweets criticizing state officials for not doing enough to enable him to prevail in their states";

- direct outreach to local and state officials "to allegedly pressure them to overturn their election results";

- filing "multiple lawsuits in jurisdictions in which he did not prevail";

- tweets "regarding rallies that occurred in Washington, D.C., in November and December 2020"; and

- planning for and conducting the January 6 Rally.

None of those acts in any way related to any power or responsibility of the Presidency.  Appellant was not exercising any "presidential function." *Id.* at 83–84.  Even as to Appellant's speech-related conduct, on which Appellant places singular focus in his briefing, *see infra* Section II.A.1, the District Court held it did not constitute "speech in furtherance of any official duty." *Id.* at 83.  Because "[t]hese are unofficial acts," the District Court reasoned, "the separation-of-powers concerns that justify the President's broad immunity are not present here." *Id.* at 84.  And by the same token, the District Court held that the prospect of civil liability arising from any of those acts would not "divert . . . the President's attention during the [official] decisionmaking process," because the acts—each extraordinary in their own right— were so far afield from the ordinary exercise of presidential duties. *Id.* (quoting *Jones*, 520 U.S. at 694 n.19).

The same is true here.  And again, the Amended Complaint in this litigation alleges significant conduct not at issue in *Thompson*, including the core allegation

that Appellant attempted "to prevent Congress from certifying the election results through the use of force, intimidation, and threats." JA49, ¶ 2. Even if this Court accepts Appellant's invitation to analyze certain individual acts alleged, rather than look at the alleged conduct as a whole, no official duties of the Presidency provided a mandate for Appellant to spread false claims of election fraud, intimidate electoral officials, incite a mob, direct it to the Capitol, or undertake any of the planning, financing, or promoting that led to the January 6 Attack. Appellant cannot benefit from immunity no matter the level of generality at which this Court evaluates his alleged conduct.

## II.    The District Court Rightly Rejected Appellant's Dangerously Overbroad Claims of Presidential Power.

To avoid civil liability for his attempt to interfere with Congress's certification of the election, Appellant offers a handful of disjointed arguments, hoping that the Court will be persuaded by one. For the reasons discussed below, all fail.

### A.    Appellant's actions cannot be immunized on the ground that he was speaking as President on a matter of public concern.

#### 1.    Appellant's focus on his speech is a red herring.

Appellant argues that a President's speech on matters of public concern is *per se* immune from liability. Even if that were true—it is not—it would make no difference. This litigation does *not* attempt to hold Appellant liable for a speech. Appellant merely seeks to divert the Court's attention from the conduct actually at issue

31

in this case: Appellant's attempt, manifested through speech and actions, to obstruct Congress from fulfilling its duties. *See supra* Section I.B. To be sure, the Amended Complaint includes allegations that Appellant used his speech to direct his supporters to "march on the Capitol to stop the Congressional count of electoral votes." JA92, ¶ 120; *see also* JA90–92, ¶¶ 115–122. But Appellant's speech inciting a mob to storm the Capitol is simply one action evidencing his attempt to interfere with Congress's certification of the election—not an independent basis for liability.[3] *See supra* Section I.B.

The question whether Appellant could be held liable for giving a speech, standing alone, is not relevant here and this Court need not decide it. Appellees have not alleged any such thing. Because the "act complained of" is Appellant's attempt to block Congress from discharging its duties, not his speech alone, Appellant's invented public speech loophole has no bearing on this case and should be rejected. *Banneker Ventures*, 798 F.3d at 1141.

---

[3] Appellant mischaracterizes the District Court's decision by claiming it held that his speech-related conduct was "a function of the presidency." Brief 12. Not so. The District Court explicitly stated that "the words spoken by the President"—both in his January 6 speech and in tweets beforehand—were *not* "speech in furtherance of any official duty." *Thompson*, 590 F. Supp. 3d at 83.

### 2.   Appellant's challenges to the plausibility of the conspiracy allegations are not before this Court.

To avoid contending with the actual misconduct at issue, which extends far beyond his speech alone, Appellant calls the allegation that he attempted to obstruct Congress's certification of the election "implausible," "preposterous," and "conclusory."  Brief 18.  This argument, too, is a diversion from the question before this Court.  The plausibility of Appellees' allegations and the sufficiency of their pleadings is not at issue in this appeal.  Appellant did not challenge the sufficiency of the allegations to state a claim under 42 U.S.C. § 1985.  *See* JA132 (noting the Trump Defendants are "[c]uriously, the only Defendants that have not" argued that "Plaintiffs have failed to plead a plausible conspiracy to support a claim under § 1985(1)").  Having waived the opportunity to contest plausibility below, Appellant cannot raise this argument for the first time on appeal.[4]  Even if the argument had been preserved, denial of a Rule 12(b)(6) motion to dismiss is not subject to interlocutory appeal.

---

[4] Even if Appellant had advanced such an argument, it would have been rejected. The Amended Complaint sufficiently alleges Appellant agreed to disrupt the certification of the election through the use of force, intimidation, and threats.  *Smith v. Trump*, No. 1:21-cv-2265-APM (D.D.C. Jan. 17, 2022), ECF No. 118 at 19–21; *see supra* Section I.B.  The Amended Complaint is full of allegations that evidence Appellant's attempt to disrupt, including that he provided encouragement and support to the attackers in the run-up to January 6, *supra* at 5–10; took steps to pressure federal and local officials into delaying or obstructing the certification process, *supra* at 7–8; and sought to exploit the chaos instead of acting decisively to end the January 6 Attack, *supra* at 10–12.

*See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1133 (D.C. Cir. 2004).

Appellant's "Statement of Issue Presented" makes clear that the only question before this Court is whether his alleged misconduct—attempting to prevent Congress from certifying the election results through the use of force, intimidation, and threats—falls within the scope of a President's official responsibilities and thus is subject to presidential immunity. *See* Brief 3 ("Statement of Issue Presented: Whether President Trump is absolutely immune from the claims made in this lawsuit."). The answer to that question is a resounding "no." *Supra* Section I.B.

This Court should reject Appellant's attempt to rewrite Appellees' Amended Complaint and turn this case into one about his speech alone. And this Court should not permit Appellant to contest for the first time that Appellees plausibly pleaded he attempted to interfere with Congress's duties.

### B.    Appellant has not identified any official responsibility that would encompass the misconduct at issue.

Setting aside the fact that this case is not solely (or even primarily) about speech, Appellant's purported "rule" that all presidential speech on matters of public concern is immunized runs contrary to the Supreme Court's precedent and must fail. Dispatching the established standards applied to presidential immunity in favor of a First Amendment-like public concern test would erode the constitutional principles

34

used to justify immunity in the first instance and would effectively eviscerate any limitations on presidential immunity.

1.   **A presidential immunity test grounded in First Amendment principles is incompatible with *Fitzgerald* and *Jones*.**

Appellant is wrong that presidential immunity extends to all comments made by a President on matters of public concern.  Brief 13.  His invented standard is wholly untethered from *Fitzgerald* and *Jones* and unsupported by the Constitution. In *Fitzgerald*, the Court was clear that presidential immunity is only justified insofar as it protects the President's ability to "'deal fearlessly and impartially with' *the duties of his office*."  457 U.S. at 752 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)) (emphasis added).  And in *Jones*, the Court reaffirmed that "[t]his reasoning provides no support for an immunity for *unofficial* conduct."  520 U.S. at 694.  *Fitzgerald* and *Jones* dictate that "an official's absolute immunity should extend *only* to acts in performance of particular functions of his office."  *Jones*, 520 U.S. at 694 (quoting *Fitzgerald*, 457 U.S. at 755) (emphasis added).  *Fitzgerald* and *Jones* do not "suggest[] that the President . . . has an immunity that extends beyond the scope of any action taken in an official capacity" and make clear that the President is not entitled to limitless immunity merely because of his or her title.  *Jones*, 520 U.S. at 694.

Appellant's "public concern" test, which derives from First Amendment law, not presidential immunity, runs roughshod over this precedent.   Though the

35

"boundaries of the public concern test are not well defined" in the First Amendment context, it covers speech that "can be fairly considered as relating to *any* matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a *subject of general interest* and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 452–53 (2011) (quotation marks omitted, emphasis added).

It is easy to conceive of countless "subjects of general interest" that may be of concern to the public at large, especially when discussed by the sitting President, but have no bearing on the President's official duties. *See, e.g.*, *Thompson*, 590 F. Supp. 3d at 80. By way of example, Appellant's test would mean that President Obama was acting within the scope of his official responsibilities when he tweeted out his NCAA Championship bracket on an annual basis, merely because he was discussing a matter that was receiving around-the-clock coverage on ESPN while holding the Office of the President. Indeed, because of the importance of the Office, it is likely that *anything* said by one of the most powerful people in the world on *any topic* would constitute a matter of "public concern" under the malleable definition of that phrase adopted by the Supreme Court in *Snyder*. This sort of test, which would cover statements made by the President based not on "the nature of the function performed," but on "the identity of the actor who performed it," was specifically

36

rejected by the Supreme Court in *Jones* and there is no basis to revive it here.  520 U.S. at 695 (quotation marks and citation omitted).

Appellant makes no effort to reconcile his proposed approach with the clear holdings of *Fitzgerald* and *Jones*.  Nor does he supply a constitutionally sound basis on which this Court can conclude that *any and all* speech on matters of public concern—regardless of subject matter—is necessarily in furtherance of some official presidential duty.  Because presidential immunity for all speech on matters of public concern would create an entirely new "sphere of protect[ion]" that is wholly "[un]related . . . to the immunity's justifying purposes," it must be rejected.  *Fitzgerald*, 457 U.S. at 755.

### 2. Appellant was not taking care that the laws be faithfully executed.

As an afterthought, Appellant includes a footnote arguing he "could" rely on the Take Care Clause to immunize himself from liability.  *See* Brief 12 n.3.  This passing reference to an argument he "could" have made is insufficient to raise an issue on appeal.  *See NSTAR Elec. & Gas Corp. v. F.E.R.C.*, 481 F.3d 794, 800 (D.C. Cir. 2007) (an "argument . . . found in a single footnote in [appellant's] opening brief . . . is not enough to raise an issue for our review").  Accordingly, this Court need not address it.

Even if the Court were to reach that argument, Appellant's arguments under the Take Care Clause must fail, as the District Court rightly recognized.  *Thompson*,

37

590 F. Supp. 3d at 84 (holding Appellant's actions "do not relate to his duties of faithfully executing the laws").  As the Supreme Court explained in *Fitzgerald*, the Take Care Clause entrusts the President with "the enforcement of federal law."  457 U.S. at 750.  That power is not without limit, as "the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.  The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States.'"  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952) (quoting U.S. Const. art. I, § 1).

It is nothing short of absurd for Appellant to suggest that the Constitution's directive that the President "take Care that the Laws be faithfully executed" entitled him to commit the acts alleged here: interfering with the certification of presidential elections, a matter constitutionally entrusted to a coequal branch of government. U.S. Const. art. II, § 3.  In fact, our system purposefully excludes the President from the electoral process.  The Constitution leaves it to the States and Congress to determine when and how Presidents are elected.  *See* U.S. Const. art. II, § 1.  And the Constitution and the Electoral Count Act each exclude the President from any role in counting electoral votes.  U.S. Const. amend. XII; 3 U.S.C. § 1 *et seq*.  The omission of the President from the constitutional scheme to certify elections is "equivalent to an express prohibition" on his participation.  *Clinton v. City of New York*, 524 U.S. 417, 439 (1998) (Constitution's silence on the line-item veto was akin to a

prohibition). And this prohibition reflects an active choice by the Founders, who wanted to place "every practicable obstacle" between the electoral vote process and "cabal, intrigue, and corruption," those "most deadly adversaries of republican government." The Federalist No. 68 (Alexander Hamilton).

To give the sitting President any say over the counting of electoral votes would undermine the Framers' decisions to safeguard the peaceful transfer of power. Thus, the Take Care Clause would have Appellant *refrain* from interference with the electoral vote count, not cause it. By seeking to insert himself into that process, Appellant tried to usurp power left to a coequal branch of government and "impair [Congress] in the performance of its constitutional duties." *Jones*, 520 U.S. at 701 (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)); *accord Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986); *I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983); *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880). In other words, Appellant was not "taking care" that the law be faithfully executed; he was trampling on the very separation of powers principles that animate presidential immunity. *Fitzgerald*, 457 U.S. at 754.

**C.    Appellant's motives are irrelevant to presidential immunity.**

Appellant also argues that considering Appellees' allegations on the merits would require an improper probing of his motives. Brief 19–20. Not so. In *Fitzgerald*, the Supreme Court found it could not probe the President's "motives" by

39

asking *why* President Nixon dismissed Fitzgerald from his Air Force position—whether the termination was "to promote efficiency," or "in retaliation for his testimony to Congress." *Fitzgerald*, 457 U.S. at 756. Here, similarly, a motive analysis would ask *why* Appellant attempted to interfere with Congress's certification of the election. For example, was Appellant acting on a sincere belief that the election was stolen from him? Did he believe that the legal process for certifying elections was being used to reach a fundamentally unfair outcome? Or did he simply wish to stay in power at all costs?

These questions are irrelevant, and Appellees do not ask this Court to answer them. The act complained of—attempting to prevent Congress's certification of the election results through force, intimidation, and threats—is beyond Appellant's official duties *no matter why* he did it.

Whether Appellant was acting within the bounds of his official responsibilities, and thus entitled to immunity, can and should be determined without assessing Appellant's motivations. Appellant's argument to the contrary fails.

**D.    This case will not open the "floodgates" to boundless liability for official acts.**

Additionally, Appellant argues that adjudication of Appellees' claims would "open wide" "the floodgates of litigation." Brief 19. That concern is baseless and rests on a deliberate oversimplification of Appellees' allegations.

40

Appellant says Appellees "simply allege a violation of law to circumvent absolute immunity," a practice which could be replicated with ease by other plaintiffs. *Id.*[5] That is false. Appellees have consistently argued that Appellant is not entitled to immunity because the action at issue—attempting to obstruct Congress's certification of the election—is not within the outer perimeter of the President's official duties. And Appellees have made detailed allegations of a months-long course of conduct that demonstrate that attempt to obstruct. This sort of behavior by a sitting President has never occurred in our country's history. A "flood" of vexatious litigation is not likely to occur if Appellant is held accountable.

The Supreme Court considered Appellant's precise argument in *Jones* and was "not persuaded" that there is any "serious" risk of a "large volume of politically motivated harassing and frivolous litigation" by denying immunity for sexual harassment claims. *Jones*, 520 U.S. at 708. The Court reasoned:

> Most frivolous and vexatious litigation is terminated at the pleading stage or on summary judgment, with little if any personal involvement by the defendant. Moreover, the availability of sanctions provides a significant deterrent to litigation directed at the President in his unofficial capacity for purposes of political gain or harassment. History indicates that the likelihood that a significant number of such cases will be filed is remote.

---

[5] Followed to its logical conclusion, Appellant's argument would hold that, wherever a President is accused of violating the law, the President must be granted immunity. But this funhouse distortion of the usual principles of liability would make presidential immunity boundless. *Fitzgerald* and *Jones* preclude such a result.

41

*Id.* at 708–09. The Supreme Court's rationale in *Jones* applies with equal or greater force here.

Denial of immunity in this case would not open the door to all manner of lawsuits challenging official presidential acts on flimsy allegations of illegality. Rather, it would ensure accountability for extraordinary misconduct that has no relation to a President's official responsibilities, based on a well-pleaded complaint. And, as in *Jones*, here too, "[h]istory indicates that the likelihood that a significant number of such cases will be filed is remote." *Id*. This is fully in line with the motivating principles of presidential immunity.

### E.    Appellant wrongly conflates Westfall Act immunity with presidential immunity.

In a final misguided attempt to stretch presidential immunity beyond its constitutional limits, Appellant argues that he should be immunized here because other public officials are granted immunity in similar circumstances. Brief 22–26. Appellant is wrong.

Appellant suggests that case law applying absolute immunity to judges and prosecutors supports application of absolute presidential immunity to him here. But like the president, judges and prosecutors are granted immunity only for "acts *in performance of particular functions of [the] office*." *Fitzgerald*, 457 U.S. at 755 (emphasis added); *see also Jones*, 520 U.S. at 694–95. Courts have not hesitated to deny immunity to judges and prosecutors where they act outside the scope of their

official duties. *See, e.g.*, *Forrester v. White*, 484 U.S. 219, 229 (1988) (declining to extend immunity to judge "acting in an administrative capacity"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 277–78 (1993) (finding that prosecutor's "statements to the media [were] not entitled to absolute immunity"). Because Appellant's actions here had no connection with his official duties, presidential immunity should be denied to him, just as it would be for a judge or prosecutor who engaged in similar misconduct.

Appellant's invocations of Westfall Act immunity are likewise unavailing, for three reasons. *First*, Westfall Act immunity is a statutory defense to claims brought under the Federal Tort Claims Act, and the FTCA is not at issue in this case. It therefore has no application here.

*Second*, Appellant is categorically wrong that "the Westfall Act is narrower than the outer perimeter test of presidential immunity." Brief 26. The Second Circuit specifically rejected that argument in a recent decision, holding Westfall Act immunity is *broader* than absolute presidential immunity. *Carroll v. Trump*, 49 F.4th 759, 765 n.3 (2d Cir. 2022). In other words, even if some conduct were eligible for immunity under the Westfall Act, it would not necessarily be shielded by presidential immunity, a narrower protection. The Westfall Act cannot even provide a useful analogy here.

*Third*, even if Westfall Act immunity was analogous to presidential immunity—and it is not—the Westfall Act would not immunize any of the conduct at issue in this case.  Appellant incorrectly argues that Westfall Act immunity categorically "encompasses statements to the press."  Brief 25 (citing *Wuterich v. Murtha*, 562 F.3d 375, 385 (D.C. Cir. 2009)).  Once again, the Amended Complaint alleges far more conduct than merely statements to the press.  But in any case, Appellant's view of the Westfall Act was expressly rejected in *Carroll v. Trump*, where the D.C. Court of Appeals *refused* to rule categorically "that the conduct of elected officials speaking to the press is always within the scope of that official's employment" under the Westfall Act.  66 F.4th 91, 93 (2d Cir. 2023) (quotation marks omitted) (discussing answer from D.C. Court of Appeals to certified question).  Instead, the court noted that a "fact-bound inquiry" was necessary to determine whether the conduct at issue was within the scope of employment and encompassed by the Westfall Act.  *Id.* (quotation marks omitted).

Under the standards that actually apply to this case, as clearly articulated by the Supreme Court, Appellant cannot establish that the challenged conduct was in furtherance of some official duty.  That is enough to end this Court's immunity inquiry.

### III. *Brandenburg* Is Irrelevant to the Scope of Presidential Immunity, and in Any Event, Satisfied Here.

#### A. Whether Plaintiffs have adequately pleaded incitement under *Brandenburg* is not before this Court.

The Government proposed in an amicus brief in the *Blassingame* litigation that where a plaintiff's claims arise from the public speech of the President, the scope of presidential immunity should turn on whether the plaintiff had adequately alleged incitement to imminent private violence in satisfaction of the *Brandenburg* standard. That argument is not before this Court here. The Government has not argued that Appellant's claim of immunity as to Appellee's allegations in *this* case should turn on the *Brandenburg* standard. The District Court below did not rely on *Brandenburg* in any way in ruling that Appellant is not eligible for presidential immunity. *See Thompson*, 590 F. Supp. 3d at 73–84; JA125 (incorporating by reference presidential immunity analysis in *Thompson*). And neither Appellant nor Appellees have asked this Court to rely on *Brandenburg* in evaluating Appellant's immunity claim. Indeed, Appellant insists that the Government's *Brandenburg* argument was "concocted . . . from whole cloth" and "is flatly inconsistent with" the Supreme Court's governing decision on presidential immunity in *Fitzgerald*. Brief 36. Appellees are not advocating for a *Brandenburg* analysis either; such a standard is irrelevant here as it would not resolve Appellees' allegations regarding Appellant's non-speech conduct. *See infra* Section II.A.1.

Under these circumstances this Court should not even consider the *Branden-burg* argument advanced by the Government in *Blassingame*.  This Court has previously held that an argument advanced by an amicus "that . . . is rejected by the actual parties to this case . . . is not properly before [it]."  *Elrod v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001).  The Supreme Court has adopted a similar approach.  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 721 (2014) ("We do not generally entertain arguments that were not raised below and are not advanced in this Court by any party, and there are strong reasons to adhere to that practice in these cases." (internal citations omitted)).

That same rule applies with special force here, where the Government has made no argument at all and both parties to this appeal think a *Brandenburg*-related test is inapt.  That is reason enough to set it aside.

## B.   *Brandenburg* is irrelevant to the conduct alleged in the Amended Complaint.

*Brandenburg* articulated the standard for determining when pure speech crosses the line from protected expression to unprotected incitement to violence.  *Brandenburg* did not, however, address the extent to which states can proscribe acts or conduct that are *not* speech.  *See United States v. Bell*, 414 F.3d 474, 482 n.8 (3d Cir. 2005) (observing that "*Brandenburg* clearly does not apply to the kind of unprotected or unlawful speech or speech-acts (e.g., aiding and abetting, extortion, criminal solicitation, conspiracy, harassment, or fighting words) at issue"); *see also United*

46

*States v. Sattar*, 395 F. Supp. 2d 79, 102 (S.D.N.Y. Oct. 24, 2005) ("*Brandenburg* and its progeny are not applicable here, where [defendant] was found to have participated in the Count Two conspiracy to murder, rather than having merely engaged in advocacy. *Brandenburg* analysis does not apply to unlawful speech-acts such as conspiracy or aiding and abetting."), *aff'd*, 590 F.3d 93 (2d Cir. 2009). Appellees alleged that Appellant attempted to disrupt Congress' certification of the 2020 Election and overturn the democratic process through threats, intimidation, and violence. *See, e.g.*, JA49–52, ¶¶ 2, 7, 9; JA67–68, ¶ 70; JA76, ¶ 85; JA95, ¶ 128; JA97–98, ¶ 138; *supra* at 5–12. This action does not seek to recover from Appellant for his speech, but for his active participation in a plot to interfere with our democracy. *Brandenburg* is irrelevant to the facts alleged here.

### C.  *Brandenburg* is irrelevant to presidential immunity.

The *Brandenburg* standard is *also* irrelevant to the scope of presidential immunity—the only question presented here. The Supreme Court has explained that the scope of presidential immunity turns on whether a President's actions were undertaken "in the discharge of [the President's] official duties." *Fitzgerald*, 457 U.S. at 752 n.32. This test protects the separation of powers; it has nothing to do with the First Amendment's protections for speech. *See id.* at 751–53 (recognizing importance of presidential immunity to "the effective functioning of government"). This Court should not conflate the two.

D.    **Even if *Brandenburg* did supply the appropriate test for analyzing Appellant's claim of immunity, Appellees have satisfied it.**

Even if *Brandenburg* were somehow relevant here—it is not, for multiple reasons—the allegations of the Amended Complaint more than satisfy that standard.  In *Blassingame*, the Government suggested that a President should *not* be immune to allegations arising from his speech where that speech constitutes what *Brandenburg* called "incitement to imminent private violence."  Brief for United States as *Amicus Curiae*, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. Mar. 2, 2023), Doc. #1988265.  In applying the *Brandenburg* standard, courts consider whether "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of [the] speech." *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015).  Courts also consider other factors such as whether the speech is directed at particular persons or groups of people, *see Hess v. Indiana*, 414 U.S. 105, 107–08 (1973), and the broader context in which the speech occurs, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 420 (1992) (Stevens, J., concurring).

*Brandenberg*'s requirements are easily satisfied here.  As alleged in the Amended Complaint, Appellant made at least the following statements during the January 6 rally that intentionally encouraged violence, and imminent lawless action was likely to result:

- Attempting to intimidate members of Congress into stopping the certification of the election by pointing to the size of the crowd descending on the Capitol and tweeting, "**Washington is being inundated with people** who don't want to see an election victory stolen by emboldened Radical Left Democrats. **Our Country has had enough, they won't take it anymore!** We hear you (and love you) from the Oval Office. MAKE AMERICA GREAT AGAIN!" JA88–89, ¶ 110 (emphases added).

- Telling the crowd at the January 6 rally "**we will never give up**" or "concede," because "you don't concede when there's theft involved," and "**We must stop the steal and then we must ensure that such outrageous election fraud never happens again, can never be allowed to happen again**." JA90–91, ¶ 115 (emphases added).

- In response to chants of "Storm the Capitol" by the crowd at the January 6 rally, exclaiming "[w]hen you catch somebody in a fraud, **you're allowed to go by very different rules** . . . Something's wrong here, something is really wrong, can't have happened and **we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore**." JA91–92, ¶¶ 118–19 (emphases added).

- Directing the mob at the Capitol by instructing them to "**walk down Pennsylvania Avenue**" to give "weak" Republicans "pride and boldness . . . to **take back our country!**" JA92, ¶ 120 (emphases added).

Each of these statements expressly sought, as Appellant admitted, to incite the crowd at the January 6 Rally to turn violent and lawlessly prevent Congress from certifying the results of the election. JA90, ¶ 114; JA92, ¶ 120. And violence and lawless action were of course "the likely result" of the speech—the speech in fact resulted in violence. As the Amended Complaint exhaustively details, after Appellant spoke at the January 6 Rally, thousands of people in his audience followed his instruction to march to the Capitol and then stormed it, attacking and injuring dozens of

Capitol Police officers, including Appellees.  *See* JA92–101, ¶¶ 123–43; JA105–10, ¶¶ 156–64.  These allegations more than satisfy the *Brandenburg* standard.

Appellant nowhere argues that the *Brandenburg* standard is a reason to find that he is immune here, and he agrees that the *Brandenburg* standard is irrelevant to the scope of presidential immunity.  Appellant does argue that his use of the phrase "fight like hell" was taken out of context and that his expression was "clearly metaphorical, referring to a political 'fight.'"  Brief 31.[6]  His reading is also both highly questionable and makes little sense given the immediately preceding statement that "when you catch somebody in a fraud" "you're allowed to go by [very] different rules."  JA92, ¶ 119.  His request for this Court to draw an inference in his favor is also improper on a motion to dismiss.  *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002) ("In ruling on a motion to dismiss a complaint the district court must draw all reasonable inferences in favor of the plaintiff.").  And regardless, that fig leaf of an argument does nothing to address the many *other* statements he made on January 6—such as directing rallygoers to "walk down Pennsylvania Avenue" and "take back our country," JA92, ¶ 120—that encouraged violence or lawless action, and that actually resulted in such violence or lawless action.[7]

---

[6] Appellant does not even suggest that this reading of his speech should be a reason to invoke the *Brandenburg* standard.

[7] Appellant argues, confusingly, that if the Government's *Brandenburg*-based test applies, he should be entitled to immunity unless it was "clearly established" that his

## IV. Civil Liability Is a Wholly Independent Form of Relief from Impeachment and Is Warranted Here.

In his final argument, Appellant asserts that a President is virtually "unassailable" in the civil context and that the prospect of impeachment should sufficiently rein in a President's conduct. Brief 36–37. Because Appellant was impeached but not convicted for "inciting an insurrection" against the United States government, he claims he should not be held accountable in any forum for that conduct. *Id.* This Court should categorically reject Appellant's lawless argument.

*First*, the Supreme Court has clearly and repeatedly held that the individual holding the Office of the President is subject to civil liability like anyone else. As the Supreme Court explained in *Jones*, "although the President 'is placed [on] high,' 'not a single privilege is annexed to his character[.]'" *Jones*, 520 U.S. at 696 (quoting 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)). Appellant, like every other person who has served or will serve as President, is "far from being

---

speech was actionable at the time. Brief 27. Under that standard, he insists he should benefit from immunity because it is a "debatable proposition" whether his speech on January 6 qualifies under *Brandenburg*. Brief 35. This Court should not accept this argument. Appellant appears to confuse the fundamental distinction between qualified immunity, which shields official action if it is not "clearly established" that action was unlawful, and presidential immunity, which the President enjoys under certain circumstances. *See Schrob v. Catterson*, 948 F.2d 1402, 1407 n.5 (3d Cir. 1991) ("The procedural difference between absolute and qualified immunity is significant." (quotation marks omitted)). Appellant also fails to offer any argument how this approach would square with the rationales the Supreme Court has set out for presidential immunity in *Fitzgerald* and *Jones.*

above the laws," and must be "amenable to them in his private character as a citizen[.]" *Id.*; *see also* Brief 36 (quoting this very line, though missing its significance). Appellant's argument now—that he is "unassailable" except through the mechanism designed to remove Presidents from office—is irreconcilable with the Supreme Court's precedents.

*Second*, Appellant's argument is senseless on its face. Impeachment and presidential immunity have manifestly different standards and goals. The Constitution provides that Congress may remove a President from office for "treason, bribery or other high crimes and misdemeanors." U.S. Const. art. II, § 4. Presidential immunity, on the other hand, precludes civil liability for acts that occur "within the 'outer perimeter' of [a President's] official responsibility." *Fitzgerald*, 457 U.S. at 756. Appellant's conflation of the two is like arguing a person acquitted of arson cannot be sued civilly for property damage, despite the fact that the crime and tort involve different elements and standards of proof. Not every act that is outside of a President's scope of official responsibility will amount to treason, bribery, or high crimes and misdemeanors. And just as a defendant who evades conviction for a crime may still be held liable in tort for the same conduct, a President who escapes conviction and removal from office can still be held liable for his conduct while serving in office where that conduct falls outside the "outer perimeter" of his official duties. The Senate did not convict Appellant of "high crimes and misdemeanors" for his

conduct.  But a jury in this action should be permitted to make its own determination about whether that conduct satisfies the elements of Appellees' claims.

## CONCLUSION

For the foregoing reasons, this Court should decline Appellant's invitation to expand presidential immunity and affirm the District Court's denial of his motion to dismiss.

July 28, 2023

*/s/ Katherine Marquart*
Katherine Marquart
Lauren M. Blas
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Connor S. Sullivan
Mark J. Cherry
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Duncan Taylor
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

Joshua S. Lipshutz
Alyse Ullery-Glod
Samuel Z. Whipple
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Appellees Conrad P.
Smith, Danny L. McElroy, Byron
Evans, Governor Latson, Melissa
Marshall, Michael Fortune, Jason
Deroche, and Reginald Cleveland*

Respectfully submitted,

Jon Greenbaum, D.C. Bar No. 489887
Edward G. Caspar, Bar No. 64206
Marc P. Epstein, D.C. Bar No. 90003967
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org

Faith E. Gay
Joshua S. Margolin
Babak Ghafarzade
Elizabeth H. Snow
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

*Counsel for Appellees Conrad P. Smith,
Danny L. McElroy, Byron Evans,
Governor Latson, Melissa Marshall,
Michael Fortune, Jason Deroche, and
Reginald Cleveland*

54

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14 point) using Microsoft Word.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 12,245 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

July 28, 2023                                  Respectfully submitted,

                                                      */s/ Katherine Marquart*
                                                      Katherine Marquart

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2023, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

July 28, 2023                                    Respectfully submitted,

                                                 */s/ Katherine Marquart*
                                                 Katherine Marquart