## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONRAD SMITH, *et al.*,       ) | |
|      ) | |
|    Plaintiffs,    ) | |
|      ) | |
|    v.    ) | **Case No. 21-cv-02265 (APM)** |
|      ) | |
| DONALD J. TRUMP, *et al.*,      ) | |
|      ) | |
|    Defendants.    ) | |
|      ) | |

## MEMORANDUM OPINION AND ORDER

### I.

This case is another civil action before this court seeking redress for the events of January 6, 2021. Much like prior cases, Plaintiffs in this matter are U.S. Capitol Police Officers who were at the U.S. Capitol on January 6th.[1] *See Blassingame v. Trump*, No. 21-cv-858-APM (D.D.C.); *Moore v. Trump*, No. 22-cv-10-APM (D.D.C.); *Tabron v. Trump*, No. 22-cv-11-APM (D.D.C.); *Kirkland v. Trump*, No. 22-cv-34-APM (D.D.C.). Their allegations and claims are in all material respects similar to those made in earlier suits. Much like the predecessor cases, these Plaintiffs assert claims under (1) 42 U.S.C. § 1985(1), (2) 42 U.S.C. § 1986, and (3) the District of Columbia Bias-Related Crimes Act, D.C. CODE § 22-3704, as well as common law claims of (4) battery, (5) assault, and (6) negligence.

What is unique about this case is the number and type of named defendants. The earlier actions focused mainly on former President Donald J. Trump and attempted to hold him liable for the events of January 6th. Those actions included a few individual defendants and some groups.

---

[1] Plaintiffs in this action are Conrad Smith, Danny McElroy, Byron Evans, Governor Latson, Melissa Marshall, Michael Fortune, Jason Deroche and Reginald Cleveland. Am. Compl., ECF No. 89, ¶¶ 11–18.

*See Thompson v. Trump*, No. 21-cv-400-APM (D.D.C.) (also naming Rudolph Giuliani, the Oath Keepers, Proud Boys International, Warboys LLC, and Enrique Tarrio); *Swalwell v. Trump*, 21-cv-586-APM (D.D.C.) (also naming Donald Trump, Jr., Representative Mo Brooks, and Giuliani). Plaintiffs in this matter, however, have named many more individual defendants—20 in total, including President Trump.  They also have named six entity defendants.[2]

Many but not all Defendants have moved to dismiss the complaint.[3]  The arguments they raise are in large part duplicative of those the court already considered and addressed in *Thompson v. Trump*, No. 21-cv-400-APM, 2022 WL 503384 (D.D.C. Feb. 18, 2022).   Because of this substantial overlap, the court in this memorandum opinion will fully address only those arguments that are made for the first time by these Defendants.   For those arguments that are the same as those asserted previously, the court simply will reference the *Thompson* opinion and fully incorporate the court's reasoning and decision here.

## II.

President Trump raises the same arguments he has in other cases for why the complaint must be dismissed against him at the threshold: (1) he is absolutely immune from suit for the acts

---

[2] The individual Defendants in this action include: (1) President Trump; (2) Ali Alexander; (3) Brandon J. Straka; and (4) Roger J. Stone, Jr.  The other individual Defendants are all alleged to be associated with a militia group.  From the Proud Boys, the complaint names (5) Enrique Tarrio; (6) Ethan Nordean; (7) Joseph. R. Biggs; (8) Zachary Rehl; (9) Charles Donohoe; and (10) Dominic Pezzola.  From the Oath Keepers, it names (11) Stewart Rhodes; (12) Thomas E. Caldwell; (13) Jessica Watkins; and (14) Kelly Meggs.  And, from the Three Percenters, it names (15) Alan Hostetter; (16) Russell Taylor; (17) Erik Scott Warner; (18) Felipe Antonio Martinez; (19) Derek Kinnison; and (20) Ronald Mele.  In addition to these 20 named defendants, Plaintiffs name 10 "John Doe" individual defendants. Plaintiffs also bring suit against the following entity defendants: (1) Donald J. Trump for President, Inc.; (2) Make America Great Again PAC; (3) Stop the Steal LLC; (4) Proud Boys; (5) Proud Boys International, LLC; and (6) Oath Keepers.

[3] The defendants who have moved to dismiss (in the order in which they appear on the docket) are: (1) Ethan Nordean, ECF No. 95; (2) Derek Kinnison, ECF No. 96; (3) Felipe Martinez, ECF No. 97; (4) Brandon J. Straka, ECF No. 98; (5) Roger Stone, ECF No. 100; (6) Zachary Rehl, ECF No. 102; (7) President Trump, Donald J. Trump for President, Inc., and Make America Great Again PAC, ECF No. 103; (8) Kelly Meggs, ECF No. 110; (9) Thomas Caldwell, ECF No. 115 [hereinafter Caldwell Mem.]; (10) Ronald Mele, ECF No. 117; and (11) Ali Alexander, ECF No. 120. All other Defendants have either filed an answer or not yet appeared.  The court notes that Defendant Caldwell's motion, in large part, joins in the other motions.  Caldwell Mem. at 1.  He also provides a list of 36 single-sentence reasons why the claims must be dismissed.  *Id.* at 1–2.  The court does not consider these undeveloped arguments.

alleged, and (2) the political question doctrine, res judicata and collateral estoppel, and the Impeachment Judgment Clause all bar judicial review of the claims against him. Defs.' Mot. to Dismiss, ECF No. 103, Defs.' Mem. in Supp. of their Mot., ECF No. 103-1 [hereinafter Trump Defs.' Mem.], at 9–22. The court rejects all of these arguments, except as to one claim, for the same reasons it did in *Thompson*. *See Thompson*, 2022 WL 503384, at *11–24. As it did in *Thompson*, the court will dismiss the § 1986 claim against President Trump on immunity grounds. *See id.* at *19.

III.

Two Defendants, Stone and Mele, argue that Plaintiffs lack constitutional standing because they have not plausibly alleged the essential element of causation. Def. Roger Stone's Mot. to Dismiss Compl., ECF No. 76 [hereinafter Stone Mot.], Mem. of P. & A. in Supp. of Def's Mot., ECF No. 76 [hereinafter Stone Mem.], at 6–7; Def. Ronald Mele's Mot. to Dismiss the Am. Compl., ECF No. 117 [hereinafter Mele Mem.], at 6. But these arguments misunderstand the standing inquiry. When assessing Article III standing, courts must assume the merits of the plaintiff's claims. *Est. of Boyland v. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019). The court therefore must start from the premise that Defendants did participate in the alleged conspiracies and did aid and abet the common law torts of assault and battery. Viewed in that way, Plaintiffs easily have established the element of causation.

Defendants Nordean and Kinnison argue that Plaintiffs lack standing because they do not have the right to seek redress for injuries to third parties. Def. Nordean's First Mot. to Dismiss the Am. Compl., ECF No. 95 [hereinafter Nordean Mem.], at 8–10; Def. Kinnison's First Mot. to Dismiss the Am. Compl., ECF No. 96 [hereinafter Kinnison Mem.], at 6–8. This argument rests on a misunderstanding of the claims asserted under § 1985(1), § 1986, and the District of Columbia

3

Bias-Related Crimes Act ("BRCA").  It is true that the conspiracies allegedly targeted various political actors to prevent them from performing their duties on January 6th.  But what Plaintiffs seek to remedy is not the injuries of those actors but their own.

To the extent Defendants' arguments can be interpreted as a challenge to Plaintiffs' *statutory* standing to advance the claims—that is, that Plaintiffs lack a cause of action—they are also wrong.  *See also* Def. Straka's Mot. to Dismiss Pls. Am. Compl., ECF No. 98 [hereinafter Straka Mem.], at 10–13 (arguing that to be actionable the § 1985(1) conspiracy must be directed "at *the officer's* duties").  Section 1985 authorizes a "party" that is "injured in his person or property" to bring suit to recover damages for such injury against any "one or more of the conspirators" of a conspiracy proscribed by § 1985(1).  42 U.S.C. § 1985(3).  Similarly, Section 1986 provides that a person who neglects or refuses to act "shall be liable to the party injured . . . for all damages caused by such wrongful act."  And the BRCA provides a remedy for "any person who incurs injury" as a result of the violation of the Act.  D.C. CODE § 22-3704(a).  As injured persons, Plaintiffs plainly have statutory standing to assert these claims.

## IV.

Defendants Donald J. Trump for President, Inc. ("Trump Campaign") and Make America Great Again PAC ("Trump PAC") maintain that the court lacks personal jurisdiction over them.  Trump Defs.' Mem. at 31–34.  But this contention plainly fails; at a minimum, the court has specific jurisdiction over the Trump Campaign because it is alleged to have "planned and organized the January 6 rally" and "helped plan [for a] march" after the rally, which "the event permit prohibited."  Am. Compl., ECF No. 89, ¶ 84.  Plaintiffs allege that the rally and unpermitted march were essential elements of the conspiracy that led to their injuries.  *See, e.g.*, *id.* ¶ 116 (alleging the Trump Campaign "retweeted several tweets referring to the event as a march"), *id.*

¶ 126 (alleging that the rally attendees who marched to the Capitol were used as a "cover and to reinforce [Individual Defendants] so they could overwhelm law enforcement"). Those allegations are sufficient to establish specific jurisdiction over the Trump Campaign under the District of Columbia long-arm statute. *See* D.C. CODE § 13-423(a)(1) ("transacting any business in the District of Columbia"), *id.* § 13-423(a)(3) ("causing tortious injury in the District of Columbia by an act or omission in the District of Columbia").

As for the Trump PAC, it is unclear to the court whether it is a successor organization to the Trump Campaign or a separate entity. The Trump Campaign and the Trump PAC concede that "[t]hey are, in essence, the same legal entity filed under the same [Federal Election Commission] number." Trump Defs.' Mem. at 34. Yet, at the same time, they say that "the transition from the Campaign to Make America Great Again PAC took place after all the alleged actions in this case." *Id.* If the Trump PAC is a true successor entity to the Trump Campaign, then the court would have personal jurisdiction over it; if it is a separate entity, it is doubtful that the court does, as Plaintiffs have not alleged any conduct by the PAC (presumably because it did not exist as of January 6th). Given the lack of clarity regarding the relationship between the two entities, it would be premature to dismiss the Trump PAC from this action.

**V.**

Several Defendants argue that all claims must be dismissed against them because they rest exclusively on First Amendment protected activities. *See* Trump Defs.' Mem. at 24–31; Stone Mem. at 22–28; Nordean Mem. at 26–30; Kinnison Mem. at 22–26; Def. Martinez's First Mot. to Dismiss the Am. Compl., ECF No. 97 [hereinafter Martinez Mem.], at 1–2; Def. Rehl's Mot. to Dismiss the Am. Compl. for Failure to State a Claim, ECF No. 102 [hereinafter Rehl Mem.], at

29–34; Mele Mem. at 19–24; Mot. of Def. Alexander to Dismiss Pls.' Am. Compl., ECF No. 120 [hereinafter Alexander Mem.], at 20–22.[4]  The court agrees with some Defendants but not others.

As to President Trump, the court rejects his First Amendment defense for the same reasons it did in *Thompson.  See Thompson*, 2022 WL 503384, at *39–46.

With respect to Nordean, Kinnison, Martinez, Rehl, and Mele, each is alleged to have engaged in acts other than protected expression.  Nordean and Rehl, for example, purportedly organized and planned with other Proud Boys to attack the Capitol.  Am. Compl. ¶ 99 (alleging Nordean and Rehl were part of the "Ministry of Self Defense," which "was intended to help coordinate the Capitol Attack").  They also were among the first people to break through the security perimeter on the west side of the Capitol and charge towards the building.  *Id.* ¶¶ 125–126.  Kinnison and Martinez are alleged to have coordinated with others in advance of January 6th, and they were among the rioters on the Upper West Terrace.  *Id.* ¶¶ 99, 101, 134.  Mele is alleged to have, before January 6th, (1) joined a chat whose alleged purpose was to "organize a group of fighters to have each other's backs and ensure that no one will trample on our rights," *id.* ¶ 99(a), (2) brought weapons and tactical gear to Washington, D.C., *id.* ¶ 101, and (3) made his way to the Upper West Terrace, where he posted a video proclaiming, "We stormed the Capitol," *id.* ¶ 140(e).  These are not First Amendment-protected activities.

The court reaches a different conclusion as to Stone and Alexander.  The court views them much the way it did Giuliani and Trump Jr. in *Thompson.  See* 2022 WL 503384, at *46–47.  None of their alleged speech is unprotected expression under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that speech falls outside the First Amendment if it is "directed to inciting or

---

[4] Defendant Martinez has filed what is in effect a "me too" brief, joining Defendant Kinnison's brief.  *See* Martinez Mem. at 1.  Accordingly, the court cites to Martinez's brief only when he has made a fact-specific argument about himself.

producing *imminent* lawless action and is likely to incite or produce such action") (emphasis added).  Moreover, neither is alleged to have participated in the attack on the Capitol on January 6th nor done anything in support of the alleged conspiracy other than engage in protected expression.  Plaintiffs allude to Stone's interactions with the Proud Boys and Oath Keepers, *id.* ¶¶ 86, 98, but these allegations do not allege any unlawful activity by Stone with respect to these groups.  Alexander also is alleged to have had contacts with the Proud Boys, but not for any unlawful purpose.  *Id.* ¶ 103(d) (alleging Alexander "spoke with Proud Boys about accommodations in Washington, D.C.").  Accordingly, the court dismisses all claims against Stone and Alexander.[5]

## VI.

In this section, the court addresses various arguments made by Defendants for why Plaintiffs have failed to state a claim under § 1985(1).  The court does not consider in this section whether Plaintiffs have adequately alleged a conspiracy; that discussion comes in Section VII below.

Defendants Nordean, Kinnison, and Martinez, as well as the Trump Defendants, argue that Plaintiffs cannot sustain a claim under § 1985(1) because Members of Congress are not protected officials under that section.  Nordean Mem. at 11–13; Kinnison Mem. at 9–11; Trump Defs.' Mem. at 35–37.  The court rejects that argument for the reasons stated in *Thompson*, 2022 WL 503384, at *25–28.

The same Defendants also contend that Plaintiffs fail to state a § 1985(1) claim because Washington, D.C., does not qualify as a "State or Territory" for purposes of the statute.  The

---

[5] The Trump Campaign says in passing that "[t]he First Amendment rights to the freedom of speech and the freedom to petition for redress of grievances would preclude [the claims] even if [they] were true ([they] are not)."  Trump Defs.' Mem. at 33.  The court declines to address this wholly underdeveloped argument.

D.C. Circuit, however, stated in *McCord v. Bailey* that the District is a "State or Territory" for purposes of § 1985(2).  636 F.2d 606, 617 n.15 (D.C. Cir. 1980).  The same must be true for § 1985(1), which employs the same "State or Territory" language.  Defendants dismiss footnote 15 in *McCord* as "dicta," Def. Nordean's Reply to Pls.' Opp'n to Nordean's Mem., ECF No. 130 [hereinafter Nordean Reply], at 7, but even if it is, *McCord*'s rationale is persuasive.  The *McCord* court followed the direction of the Supreme Court in *District of Columbia v. Carter* that the meaning of the term "State or Territory" "may vary to meet the purposes of the law."  409 U.S. 418, 420–21 (1973).  Defendants are therefore wrong that the term's meaning rests solely on the "plain meaning of the text."  Nordean Reply at 7.  Considering the purposes of § 1985(2), the court in *McCord* stated, "[a] rationale that would justify establishing the District as a conspiracy enclave is difficult to conceive."  636 F.2d at 617 n.15.  Even if this court is not bound by *McCord*'s purported "dicta," the court agrees with its reasoning.

Defendants Meggs and Rehl assert that a plaintiff can file suit under § 1985(1) only if the conspirators are state actors.  In other words, because Defendants are private citizens, they cannot have conspired under § 1985(1) as a matter of law.  Def. Meggs' Mot. to Dismiss Am. Compl., ECF No. 110 [hereinafter Meggs Mem.], at 20–24; Rehl Mem. at 14–18.  The plain text of the statute, however, provides a private right of action against "persons" and "conspirators."  42 U.S.C. § 1985.  And the Supreme Court has said about the similarly worded § 1985(3), "the words of the statute fully encompass the conduct of private persons."  *Griffin v. Breckenridge*, 403 U.S. 88, 96 (1971).  The same must be true for § 1985(1).

The same two defendants assert that a claim under § 1985(1) requires the pleading of discriminatory animus.  Meggs Mem. at 25–27; Rehl Mem. at 14–17.  Discriminatory animus is not, however, an element of a § 1985(1) claim.  *Bryant v. Mil. Dep't of Mississippi*, 597 F.3d 678,

688 (5th Cir. 2010) ("A cause of action under § 1985(1) requires no allegation of racial or class-based discriminatory animus."); *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1340 (7th Cir. 1977) (rejecting assertion that a § 1985(1) claim requires pleading and proving "invidious animus").

Relatedly, Defendants Nordean and Kinnison contend that Plaintiffs' claim is really one that should be brought under § 1985(3) because that section prohibits interference with "the federal voting process."  Nordean Mem. at 15–17; Kinnison Mem. at 13–15.  Defendants posit that because Plaintiffs cannot allege invidious discrimination as required by § 1985(3), they have improperly styled their claim as one under § 1985(1).  Nordean Mem. at 15; Kinnison Mem. at 14. But this argument makes little sense.  Plaintiffs are not alleging that Defendants conspired to deprive them of "equal protection of the laws, or of equal privileges and immunities under the laws," 42 U.S.C. § 1985(3); rather, their claim is premised on injury arising from an alleged conspiracy to interfere with federal actors in the performance of their duties, which is what § 1985(1) bars.  As already discussed, a civil action is available to Plaintiffs because they are "persons" injured by the alleged conspiracy.

## VII.

The court now turns to the argument raised by nearly all Defendants: that Plaintiffs have failed to plead a plausible conspiracy to support a claim under § 1985(1).  *See* Nordean Mem. at 17–21; Kinnison Mem. at 15–18; Straka Mem. at 9–10; Meggs Mem. at 24–27; Rehl Mem. at 28–29; Mele Mem. at 11–13.  Curiously, the only Defendants that have not advanced that contention are the Trump Defendants.  *See* Trump Defs.' Mem. at 35–37 (arguing that Plaintiffs have failed to state a claim only because Members of Congress are not federal officials protected under § 1985(1)).  So, the court does not evaluate the adequacy of the conspiracy pleading as to the former President and the Trump Campaign.

**A.**

Before considering the specific allegations, the court first addresses the assertion made by Defendants Nordean and Meggs that the intracorporate conspiracy doctrine defeats the alleged conspiracy as a matter of law.  Nordean Mem. at 20–21; Meggs Mem. at 26.  According to them, applying the doctrine here means that they cannot have conspired with other members of their respective groups—Nordean with other Proud Boys and Meggs with other Oath Keepers.  Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).  The parties dispute whether the intracorporate conspiracy doctrine applies to civil rights statutes, and the circuits are split on the question.  *See id.* at 1868 ("There is a division in the courts of appeals, moreover, respecting the validity or correctness of the intracorporate-conspiracy doctrine with reference to § 1985 conspiracies."); *Bowie v. Maddox*, 642 F.3d 1122, 1130–31 (D.C. Cir. 2011) (detailing split of authorities but not deciding the question).  The court need not pick a side on that legal dispute, however, because it is apparent that the underlying rationale for the doctrine does not apply in this case.

Even those circuits that hold the intracorporate conspiracy doctrine applies to civil rights conspiracies have recognized exceptions.  *See Bowie*, 642 F.3d at 1130.  One exception is "where the corporate agents' actions were either unauthorized or motivated by 'an independent personal stake in achieving the corporation's illegal objective.'"  *Id.* (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985)).  That exception applies here.  Nordean and Meggs not only conspired with other members of their groups to advance the group's illegal objectives but acted also to accomplish their own unlawful objectives.  Notably, both Nordean and Meggs stand individually charged with obstructing an official proceeding and aiding and abetting others in doing the same,

and Meggs has now been convicted.  *See* Indictment, *United States v. Nordean*, 21-cr-175-TJK, ECF No. 380, at 25; Indictment, *United States v. Rhodes*, 22-cr-15-APM, ECF No. 167, at 34; Verdict Form, ECF No. 410.  "The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory."  *Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 275 (D.D.C. 2006) (internal quotation marks and citation omitted).  Defendants' alleged acts on January 6th are far from the "routine, collaborative business decisions" the doctrine was designed to protect.

Defendants' argument fails for a second reason: Each is alleged to have conspired with others outside of their organizations.  Am. Compl. ¶ 100 (asserting that, on December 19, 2020, Meggs sent through social media a message stating he had "organized an alliance" between the Proud Boys, Oath Keepers, and others, and said that the groups had "decided to work together"); *id.* ¶ 170(a) (alleging that all Defendants conspired with one another).  The intracorporate conspiracy doctrine does not, of course, apply to conspiracies involving persons outside the organization.

**B.**

In *Thompson*, the court set forth the principles of civil conspiracy and now incorporates them here.  *Thompson*, 2022 WL 503384, at *30.  Critically, it is important to remember that to plead a civil conspiracy, a plaintiff "need *not* show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished."  *Id.* (internal quotation marks omitted).  Some Defendants have argued that the absence of an express or formal agreement defeats the conspiracy claim.  *See, e.g.*,

Mele Mem. at 12–13 (arguing that Plaintiffs "do not identify an actual meeting, discussion, or document that evidences any communication, let alone a conspiratorial agreement between Mr. Mele and the other defendants").  That is not a correct statement of the law.

Plaintiffs have sufficiently pleaded conspiracies involving those individual Defendants who acted with other members of their groups.  The facts, if true, establish that Nordean and Rehl coordinated among themselves and others, and jointly, with others, attacked the Capitol building.  Am. Compl. ¶¶ 99(d), 105, 125–126.  Similarly, Kinnison, Martinez, and Mele are accused of coordinating among themselves and others prior to January 6th to bring weapons and tactical gear to Washington, D.C., *id.* ¶¶ 99(a), 101, and the three made their way to the Upper West Terrace, *id.* ¶¶ 134, 140(e).  Meggs is alleged to have participated with others in extensive planning and preparation for January 6th, *id.* ¶¶ 100–104, and to have entered the Capitol building with other Oath Keepers, *id.* ¶¶ 135, 195, 215.  These allegations are sufficient to establish a conspiracy as to those Defendants for purposes of § 1985(1).

Defendants say that the alleged larger conspiracy involving President Trump is far-fetched.  The court in *Thompson* explained why it is at least plausible that the President joined in a § 1985(1) conspiracy with well-known militia groups, such as the Proud Boys and Oath Keepers.  2022 WL 503384, at *33–36.  The conspiracy alleged in this case involving the President and the individual members of those groups (including the Three-Percenters) is therefore also plausible.

The court holds, however, that Plaintiffs have not alleged sufficient facts to establish Straka was part of the § 1985(1) conspiracy.  Straka's alleged conspiratorial acts primarily involve protected First Amendment activities.  Am. Compl. ¶ 72(a) (speaking to a rally in Detroit two months before January 6th); *id.* ¶ 108 (appearing at a rally on January 5th, although no words are attributed to him).  Unlike other Defendants, Plaintiffs do not allege that Straka planned and

12

prepared with others to come to Washington, D.C., on January 6th. And, although Plaintiffs allege that Straka encouraged unidentified individuals to attack the Capitol building, *id.* ¶ 127, they do not contend that he engaged in those acts as part of any group or organized effort. These allegations are not enough to plausibly plead Straka as a participant in a § 1985(1) conspiracy.

## VIII.

Up next is Plaintiffs' claim under § 1986 (Count II). To sustain a § 1986 claim, the defendant must have the *"power* to prevent or aid in preventing the commission" of the wrongful act. 42 U.S.C. § 1986 (emphasis added). As the court observed in *Thompson*, "[f]ew courts appear to have addressed [the 'power'] element, but those finding the requisite power to be present have done so where the defendant was a government official or employee with some formal authority to act." 2022 WL 503384, at \*38. Because neither Giuliani nor Trump Jr. possessed any "formal authority to act," the court in *Thompson* dismissed the § 1986 claim against them. *Id.*

Plaintiffs maintain that § 1986 reaches beyond those persons "who have some sort of formal authority." Pls.' Omnibus Mem. of Law in Opp'n to Mots. to Dismiss, ECF No. 118 [hereinafter Pls.' Opp'n], at 34. The court does not disagree. The court did not mean to imply in *Thompson* that only those persons acting under color of law can be held liable under § 1986. *See Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1007 (S.D. Tex. 1981) (observing that "since the language authorizes suit against 'every person' there is no requirement of state action or color of law under § 1986").

However, it cannot be true that merely being a participant in the § 1985(1) conspiracy also makes one liable under § 1986. The statute imposes liability on persons *both* "having knowledge that any of the wrongs conspired to be done . . . are about to be committed" *and* "having power to prevent or aid in preventing the commission of the same." 42 U.S.C. § 1986. So, it cannot be that

every person who acquires knowledge of the wrong as a participant also possesses the power to prevent it.  If that were the case, the "power" element would be rendered superfluous.

Plaintiffs' examples of what the movants could have done to prevent or aid in preventing the harms proves the point.  Plaintiffs assert that movants "each had the power to prevent or aid in preventing the harms by, among other things, (1) not attacking the Capitol; (2) telling their followers and fellow attackers not to attack the Capitol; and (3) informing law enforcement of the plan to attack the Capitol."  Pls.' Opp'n at 34.  But examples (1) and (3) are acts that could have been performed by any co-conspirator, regardless of role, because such person would have knowledge of the wrongs about to be done.  And as for (2), urging others to refrain from acting would only be effective in preventing the wrong if the person had the power to direct others to act.

To give meaning to the full text of the statute, the court thinks that to hold a private individual responsible under § 1986, the person must be someone with actual authority to compel others to act or refrain from acting.  That approach is consistent with what Reconstruction-era legislators would have understood the term "power" to mean.  *See* Noah Webster, A DICTIONARY OF THE ENGLISH LANGUAGE 300 (Rev. ed. 1856) (defining "power" to mean, among other things, "influence," "command," "the right of governing," "authority"); Noah Webster, A DICTIONARY OF THE ENGLISH LANGUAGE 328 (1867) (defining "power" to mean, among other things, "[e]xercise of any kind of control; influence; command," "[a]n individual, institution, or government, exercising control").  It means that the leader of the conspiracy or someone of higher rank within the conspiracy would qualify, but a mere foot solider would not.  *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339, 1352 (W.D. Wis. 1991) (finding a likelihood of success on the merits that an organization's

spokesperson had violated § 1986 in part because the "facts . . . tend[ed] to show [his] leadership role and influence" in the organization).

Here, Plaintiffs do not allege sufficient facts to plausibly establish that Nordean, Rehl, Caldwell, Meggs, Martinez, Kinnison, or Straka had the kind of role in their respective organizations that granted them the authority to direct others not to act. Nordean is alleged to be an "Elder of [Proud Boys International, LLC]" and "president of his PROUD BOYS local chapter." Am. Compl. ¶ 30. Rehl is described as a "member" and "president of his local PROUD BOYS chapter." *Id.* ¶ 32. The complaint makes no allegations that would explain the power of an "Elder" or president of a local chapter. Defendant Tarrio, on the other hand, is clearly designated to be the "leader of PROUD BOYS." *Id.* ¶ 29. Similarly, with respect to the Oath Keepers, Caldwell is alleged to have "conspired with" the Oath Keepers, and Meggs is alleged to be a "member of OATH KEEPERS." *Id.* ¶¶ 37, 38. Rhodes, by contrast, is identified as the "President and Director of OATH KEEPERS." *Id.* ¶ 36. And Martinez, Kinnison, and Mele are each said to be "a member of the Three Percenters." *Id.* ¶¶ 43–45. Straka's only affiliation is as "a promoter for STOP THE STEAL." *Id.* ¶ 24. Thus, none of the moving Defendants is alleged to have had the requisite "power" to be held liable under § 1986, and thus that claim is dismissed as to each of them.

## IX.

### A.

Having addressed Plaintiffs' federal claims, the court moves to Plaintiffs' District of Columbia law claims, starting with their statutory claim under the District of Columbia Bias-Related Crimes Act ("BRCA") (Count III). That statute provides a civil cause of action for, as relevant here, "any person who incurs injury to his or her person or property as a result of an

intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act," "[i]rrespective of any criminal prosecution or the result of a criminal prosecution." D.C. CODE § 22-3704. The statute defines "[d]esignated act" to mean a "criminal act, including . . . assault . . . and . . . inciting . . . assault." D.C. CODE § 22-3701(2). Defendant Mele argues that Plaintiffs have failed to plead "prejudice" based on "political affiliation of a victim" because "[a] staunch political disagreement over a contentious issue, and activities arising from it cannot be considered bias against a political affiliation as pled here." Mele Mem. at 16.

The court suggested that the BRCA claim alleged in *Thompson* suffered from this same shortcoming. 2022 WL 503384, at *48. There, Plaintiff Swalwell alleged that President Trump was "motivated by [Swalwell's] political affiliation as a political opponent of Donald Trump." *Id.* (alteration in original). The court observed that "[t]he term 'affiliation' is undefined in the statute; its ordinary meaning is 'the state of belonging to a particular religious or political group.' Opposing the President of the United States would not seem to fit that definition." *Id.* (quoting Affiliation, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/affiliation). The court did not, however, dismiss the BRCA claim because President Trump had not made the argument. *Id.*

Here, Defendant Mele asserts the argument that President Trump did not in *Thompson*, and the court will dismiss the claim for the reasons stated in *Thompson.* The term "affiliation" means "a connection with a political party or religion, or with a larger organization." *Affiliation*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/affiliation (last visited Sept. 21, 2022)). Plaintiffs here allege that the "victims of Defendants' criminal acts were Democratic members of Congress, some Republican members of Congress, and Vice President

Pence, whom Defendants perceived to be endorsing Democrats Joe Biden and Kamala Harris by announcing the election results." Am. Compl. ¶ 188.  This allegation makes clear that Defendants' "prejudice" was not based on "political affiliation," as the statute requires—after all, both Democrats and Republicans are considered victims.  Rather, their alleged "prejudice" was based on the opinion that they shared with President Trump, however misguided, that the presidential election had been stolen.  The BRCA claim therefore does not rest on "an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act." D.C. CODE § 22-3704.

## B.

Plaintiffs' common law claims for battery (Count IV) and assault (Count V) are next. These claims rest on an aiding and abetting theory of liability.  Am. Compl. ¶¶ 201, 207.  The court incorporates the principles for aiding and abetting liability it set forth in *Thompson*.  2022 WL 503384, at *50–51.

The court already has held that facts similar to those alleged here make out a plausible basis for aiding-and-abetting liability against President Trump.  *See Thompson*, 2022 WL 503384, at *50.  As for Defendant Trump Campaign, it is not clear whether Plaintiffs allege that President Trump is an agent for the campaign, such that his acts can be imputed to the campaign.  The court will not assume that he is.  Plaintiffs contend that Defendant Trump Campaign aided and abetted the alleged assault and battery because it "organized and promoted the January 6 rally, and encouraged attendees to use any means necessary to prevent certification."  Pls.' Opp'n at 45–46. But organizing and promoting the rally did not substantially assist those who assaulted and battered these Plaintiffs, and Plaintiffs point to no statement made by any campaign official on January 6th

that might be viewed as "[s]uggestive words . . . [that] plant[ed] the seeds of action." *Halberstam v. Welch*, 705 F.2d 472, 481–82 (D.C. Cir. 1983).

As for the individual movants, the court holds that Plaintiffs have made out a plausible claim of aiding-and-abetting liability. Plaintiffs have not alleged that any individual Defendant knew of or participated in the specific assault of any Plaintiff. The facts alleged, however, establish that these Defendants would have been aware that other rioters were assaulting law enforcement officers. They also establish that these Defendants provided substantial assistance to those who assaulted Plaintiffs by their actions at the Capitol on January 6th. Nordean and Rehl are alleged to be among the first people to breach the outer security perimeter at the Capitol grounds. Am. Compl. ¶¶ 125–126. Meggs is alleged to have entered the Capitol building with multiple Oath Keepers, adding to the chaos inside. *Id.* ¶¶ 135, 215. Although Caldwell did not enter the building, he was on the Capitol grounds and claimed afterwards to have been an "instigator" and "rabble rouser." *Id.* ¶ 140(a). Martinez and Kinnison are alleged to have breached barricaded areas on the Lower and Upper West Terraces, where some of the most violent fighting occurred between rioters and police officers. *Id.* ¶ 134. And Straka is alleged to have yelled directions and encouragement to other rioters and directed others to take a protective shield from a Capitol Hill police officer. *Id.* ¶ 127. These Defendants were not "[m]ere[ly] presen[t]"; they plausibly provided substantial assistance to those who assaulted Plaintiffs by breaching security lines, encouraging others to storm the building, and organizing large groups of individuals to overwhelm law enforcement. *See Halberstam*, 705 F.2d at 481.

## C.

The court now arrives at Plaintiffs' final claim of common law negligence. That claim is premised on a "negligence per se" theory: specifically, that a criminal statute supplies the standard

of care and a violation of law constitutes negligence. Am. Compl. ¶¶ 213–218 (citing three criminal statutes); *see Marusa v. District of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973) (setting forth "guidelines for determining whether violation of a criminal statute can create civil liability"). One Defendant, Mele, argues that this claim fails because none of the statutes Plaintiffs cite are the type of criminal statute that District of Columbia law would recognize to support a negligence per se theory. Mele Mem. at 18–19.[6] The court agrees.

Under District of Columbia law, a "violation of a criminal statute can create civil liability." *Marusa*, 484 F.2d at 834. Courts, at a minimum, must make three inquiries: "[1] the law or regulation should be one designed to promote safety; [2] the plaintiff must be 'a member of the class to be protected' by the statute; and [3] the defendant must be a person upon whom the statute imposes specific duties." *Id.*; *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996). Importantly, the statute offered to establish a standard of care "must not merely repeat the common law duty of reasonable care, but must set forth 'specific guidelines to govern behavior.'" *McNeil Pharm., 686 A.2d at 579* (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 558 (D.C. Cir. 1993)). For instance, in *District of Columbia v. Mitchell*, the plaintiff alleged a violation of a statute requiring that the D.C. Department of Corrections be "responsible for the safekeeping, care, protection, instruction, and discipline" of inmates at the Lorton Reformatory, but the court held that "[w]e see nothing in the statute—certainly no specifics—that could give rise to a claim of negligence per se." 533 A.2d 629, 639 (D.C. 1987); *see also Joy*, 999 F.2d at 558 (holding that aviation regulation that "simply restates the general common law duty that pilots should exercise reasonable care" did not require a negligence per se instruction). By contrast, in *Marusa*, the court held that a law making it a criminal offense to serve alcohol to persons who are intoxicated or

---

[6] Although only Mele raised this argument, because the issue is a legal one and applies equally to all movants, the court considers it as if raised by all movants.

appear to be intoxicated met the criteria for a negligence per se theory.  484 F.2d at 833–35.  The court reasoned that, as applied there, the statute imposed a duty on tavern owners meant to protect the general public from "inebriated persons."  *Id.* at 834.

The three criminal statutes on which Plaintiffs rely more closely resemble those at issue in *Mitchell* and *Joy* than *Marusa*.  D.C. CODE § 22-1322 provides that whoever "willfully engages . . . [or] incites or urges other persons to engage in a riot" of five or more persons is subject to criminal penalties.  Am. Compl. ¶¶ 213–214.  D.C. Code § 10-503.16(b)(6) bars individuals from "willfully and knowingly . . . engag[ing] in any act of physical violence upon the United States Capitol Grounds or within any of the Capitol Buildings."  Am. Compl. ¶¶ 215–216.  And 40 U.S.C. § 5104(e)(2)(F) makes it unlawful for individuals to "willfully and knowingly . . . engage in an act of physical violence in the Grounds or any of the Capitol Buildings."  Am. Compl. ¶¶ 217–218.  None of these statutes imposes "specific guidelines to govern behavior."  Rather, they are generally drawn statutes applicable to all and prohibit certain behaviors.  They therefore cannot sustain a claim of negligence per se.

## X.

Defendants Nordean and Kinnison contend that, under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the court should abstain from adjudicating this matter in favor of the criminal cases filed against these Defendants and others.  Nordean Mem. at 31; Kinnison Mem. at 26–27.  In those cases, they argue, Plaintiffs can recover mandatory restitution under 18 U.S.C. § 3663A or discretionary restitution under 18 U.S.C. § 3663.  But *Colorado River* abstention does not apply here as that doctrine involves the limited circumstances in which federal courts defer to state court proceedings.  *See Colo. River*, 424 U.S. at 817; *Edge Inv., LLC v. District of Columbia*, 927 F.3d 549, 552 (D.C. Cir. 2019).

Defendants also suggest that the court should apply "first-to-file" principles in dismissing this action in favor of the criminal cases. But "first-to-file" has no application here. Those principles are meant to promote comity and orderly administration of justice where multiple suits between the same parties involving the same causes of action are filed in different federal courts. *See Washington Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980). It has no application as between civil and criminal proceedings.

## XI.

Having addressed the arguments for dismissal of claims, the court now takes up Defendants' arguments for dismissal of certain types of remedies.

Defendant Meggs contends that Plaintiffs cannot seek injunctive relief because, in essence, they lack standing to do so. Meggs Mem. at 16–19. The court agrees. To obtain injunctive relief, a plaintiff must establish that they are "likely to suffer future injury" from the conduct at issue. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). That requires a showing that the plaintiff "face[s] an imminent threat of future injury." *In re Navy Chaplaincy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012). Here, Plaintiffs fear that they "will face the same harm in 2025, if not sooner, as they did in 2021, when they seek to protect Congress's certification of the 2024 presidential election." Pls.' Opp'n at 85. Anticipating an injury more than two years into the future is the opposite of "imminent." It is nothing more than a "vague prediction[] of future . . . conduct" that is "insufficient to demonstrate the imminent threat of future injury necessary to support standing to seek injunctive relief." *In re Navy Chaplaincy*, 697 F.3d at 1176.

Lastly, in footnotes, Defendants Nordean and Kinnison contend that Plaintiffs cannot recover punitive damages for a violation of § 1985(1). Nordean Mem. at 21 n.7; Kinnison Mem. at 18 n.6. Because Defendants have not sufficiently developed these arguments, the court will

deny the request to dismiss the claim for punitive damages.  They may, however, raise the matter again at summary judgment.

## XII.

For the foregoing reasons, the court holds as follows:

The Motion to Dismiss Count I as to the claims arising under 42 U.S.C. § 1985(1) is GRANTED as to Defendants Straka, Stone, and Alexander, and DENIED as to all other moving Defendants;

The Motion to Dismiss Count II as to claims arising under 42 U.S.C. § 1986 is GRANTED as to all moving Defendants;

The Motion to Dismiss Count III as to claims arising under the BRCA is GRANTED as to all moving Defendants;

The Motion to Dismiss Count IV as to common-law claims of battery is GRANTED as to Defendants Trump Campaign, Stone, and Alexander, and DENIED as to all other moving Defendants;

The Motion to Dismiss Count V as to common-law claims of assault is GRANTED as to Defendants Trump Campaign, Stone, and Alexander, and DENIED as to all other moving Defendants;

The Motion to Dismiss Count VI as to common-law claims of negligence is GRANTED as to all moving Defendants; and

The Motion to Dismiss as to the remedy of injunctive relief is GRANTED as to all moving Defendants.

Dated:  January 26, 2023

Amit P. Mehta
United States District Court Judge